# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | | |
|---|---|---|
| NEIL STANICH, | : | |
| BOBBIE JEAN STANICH and | : | Case No. 1:06cv962 |
| DANTE FREZZA, on behalf of | : | |
| of themselves and all others similarly situated, | : | JUDGE KATHLEEN O'MALLEY |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | ORDER REGARDING |
| TRAVELERS INDEMNITY COMPANY and | : | CLASS CERTIFICATION |
| THE STANDARD FIRE INSURANCE | : | |
| COMPANY, | : | (Findings Made) |
| | : | (Final Ruling Deferred) |
| Defendants. | : | |

This matter arises on *Plaintiffs' Motion for Class Certification* (Doc. 107), filed by named-Plaintiffs (and putative class members), Neil Stanich, Bobbie Jean Stanich and Dante Frezza.[1]  In sum, Plaintiffs seek certification of a class, divided into two subclasses.  Defendants Travelers Indemnity Company ("Travelers Indemnity") and The Standard Fire Insurance Company ("Standard Fire") (collectively, "Travelers") oppose Plaintiffs' motion (Doc. 119).[2]  The Court conducted a two-day hearing on Plaintiffs' motion,[3] at which it received oral and documentary evidence.[4]  *See* Docs.

---

[1]    Unless otherwise specified, the Court generally references the named-Plaintiffs and all putative class members as "Plaintiffs."

[2]    The parties also filed "additional authority" briefs.  *See* Docs. 122 and 126.  Also, various items have been filed "under seal."  Herein, the Court does not differentiate between public and non-public filings.

[3]    At the Court's direction (*see* Doc. 75), Plaintiffs presented an oral "reply" to Travelers' opposition at the hearing.

[4]    Plaintiffs presented 5 document exhibits through three live witnesses.  Plaintiffs witnesses were Neil Stanich (Plaintiff), Dante Frezza (Plaintiff) and Randall

124 and 125.[5]  Having carefully reviewed all of the parties' written[6] and oral submissions, the Court

concludes that:

- Plaintiffs **HAVE SATISFIED** the predominance and superiority requirements of Federal Rule 23(b)(3);

---

Pillen (Travelers Sales Executive – as on cross).  Travelers presented 1 document exhibit through 7 live witnesses.  Travelers' witnesses were Randall Pillen (as on direct), Bobbie Jean Stanich (Plaintiff – as on cross), Mark Mastrianni (Travelers Vice-President of national distribution), Lucille Mulroy (Travelers Vice-President of business technologies in personal lines), Thomas Chatham (expert witness – Travelers), John Swartz (agent who sold to Staniches) and J. Lee Covington (expert witness – Travelers).  *See* Doc. 121-2.

[5]  The hearing transcripts (two volumes) appear at Docket Entries 124 and 125; the pages are consecutively numbered.  The Court's references to that transcript are delineated as "Tr. at ___ ."

[6]  In connection with Plaintiffs' original complaint (Doc. 1), Travelers filed a *Motion to Dismiss or, in the Alternative, Motion to Strike Class Allegations* (Doc. 14), which the Court partially denied (the motion to dismiss) and partially "termed" (the motion to strike).  *See* Doc. 28.  When "terming" the motion to strike, the Court noted that Travelers' arguments therein were more appropriately directed to then-anticipated proceedings on class certification.  The Court noted that it would incorporate Travelers' arguments into its resolution of the class certification issue, but, at the same time, acknowledged that Travelers would have an opportunity to present more focused briefing on the certification issue following limited discovery and Plaintiffs' filing of a formal motion.

Later, however, Plaintiffs filed a *First Amended Class Action Complaint* (Doc. 77), thereby changing the "pleadings landscape" and formally mooting the arguments in Travelers' termed motion to strike, which related to Plaintiffs' original complaint.  This is because, on their face, it is not clear that the arguments directly translate to the *amended* allegations.  The Court cannot be expected to evaluate each argument to determine what, if any, impact the amended allegations have upon it.  In any event, the Court included in its "review" (though with less scrutiny) the filings relative to Travelers' previously-termed motion to strike (*i.e.*, Docs. 14, 15, 19 and 22) so as to prevent any prejudice to Travelers.  Regardless, Travelers no doubt included in its primary (and enlarged) opposition papers and oral presentation the arguments it deems most important, such that the Court's attention is most appropriately directed to the actual briefing (and hearing testimony / argument) on the certification motion itself.

2

- Plaintiffs **HAVE SATISFIED** the numerosity and commonality requirements of Rules 23(a)(1) and (a)(2);

- As to named-Plaintiff Dante Frezza, Plaintiffs **HAVE SATISFIED** the typicality and adequacy requirements of Rules 23(a)(3) and (a)(4); and

- As to named-Plaintiffs Neil and Bobbie Jean Stanich, Plaintiffs **HAVE NOT SATISFIED** the typicality and adequacy requirements of Rules 23(a)(3) and (a)(4).

For the reasons outlined herein, however, the Court **CONCLUDES** that certification is appropriate as to the *entire* proposed class (and subclasses) *subject to* Plaintiffs' timely identification of a new Agent SubClass representative.[7]  The Court **DEFERS** its final ruling on class certification, therefore, until after the completion of the procedures outlined in Section V.

## I.  **BACKGROUND**[8]

Plaintiffs allege that, in Ohio and other states, Travelers sells identical homeowners insurance policies at multiple prices.  This case relates to Travelers' activities in Ohio only.   Through juridically linked entities, Plaintiffs claim that Travelers was engaged in an unlawful scheme from March 1998 to May 2003 by which it deceived members of the putative class into purchasing higher-priced policies by concealing the availability of lower-priced policies that offered identical coverage

---

[7]     As outlined herein, the Court unconditionally concludes that certification is appropriate as far as the Group Marketing SubClass and its proposed representative are concerned.  In the interests of uniformity, however, the Court withholds a final ruling on certification pending completion of the procedures outlined herein relative to Plaintiffs curing deficiencies with the proposed representatives for the Agent SubClass.

[8]     This section provides only a general background and is largely based on Plaintiffs' *First Amended Class Action Complaint* (Doc. 77), as well as testimony and argument presented at the hearing.  As necessary, the Court addresses additional facts and allegations within its analysis.

3

and service.[9]  In other words, Plaintiffs criticize the multi-priced structure because the differing prices (*i.e.*, premiums) have nothing to do with underwriting factors (*e.g.*, one consumer being a greater risk than another).  Rather, multiple prices simply exist for the exact same product (*i.e.*, coverage for the exact same risk).

Plaintiffs have asserted claims for fraud and unjust enrichment.[10]  In sum, they argue that Travelers had a duty to disclose the existence of its lower-price policies *because* Travelers should have known (or did know) that its marketing process and written materials might have misled Plaintiffs to believe that the higher-priced policies were all that were available.  Plaintiffs allege that uniform reliance on Travelers' concealment of the lower-priced policies can be inferred across the class because it is reasonable to conclude that nobody would pay a higher price for an identical policy available at a lower price.  This is a hotly contested issue.

Travelers sells homeowners insurance through two distribution channels – the <u>retail</u> channel (*i.e.*, *via* independent agents) and the <u>group marketing</u> channel (*e.g.*, through employers, associations, credit card companies, etc.).[11]  In the retail channel, Plaintiffs claim that policies are sold to

---

[9]  The claims in this case originated in *Zangara, et al. v. Travelers Indemnity Company of America, et al.* ("Zangara"), which was previously dismissed by this Court in March 2006.  *See* Northern District of Ohio Case No. 1:05cv731 at Doc. 63.  In sum, the Court dismissed *Zangara* because the named-plaintiff admitted that he did not have any claims.  *See* Doc. 62 in 1:05cv731.  This case was filed shortly thereafter, the obvious purpose for which was to pick up where *Zangara* left off (but with proper parties).

[10]  With regard to class certification, the parties' debates focus only on Plaintiffs' fraud claim.  In fact, they focus only on two elements of the fraud claim – *i.e.*, duty to disclose (element one) and reliance (element five).  The Court's discussion herein, therefore (as further explained *infra*), is limited to those elements.

[11]  Throughout this litigation, these group marketing programs also have been referred to as "affinity" programs.  At the hearing, Travelers drew a distinction between "true affinity" programs and general "group marketing" programs.  Tr. at

4

consumers in the exact same risk class at different prices.  Plaintiffs allege that, because agents receive a higher commission for selling the higher-priced policies, Travelers has created a financial incentive for agents to conceal the availability of the lower-priced policies.  Indeed, Plaintiffs allege that agents are trained not to disclose the existence of the lower-priced policies even if a consumer asks about a cheaper Travelers alternative.  Plaintiffs claim, moreover, that Travelers exercises control over the sales process by providing agents with software that generates (and, therefore, enables agents to quote) multiple prices for *identical* policies based on the same underwriting criteria.  According to Plaintiffs, Travelers accomplishes this multi-price "scheme" through a network of subsidiaries.  They allege that Defendant Standard Fire is the Travelers subsidiary that sold Travelers' higher-priced policies in Ohio during the relevant period (in both sales channels), and that non-party The Automobile Insurance Company of Hartford, Ct. is the Travelers subsidiary that sold the lower-priced policies.

Similarly, in the group marketing channel, Plaintiffs allege that Travelers policies were offered at a single group rate or price.  Plaintiffs claim that class members who bought a higher-priced policy through a group marketing program were eligible to purchase an identical policy for a lower price through an independent agent; yet, as with the retail channel, they were not informed of this fact by Travelers.

Travelers admits that it sold identical policies at different prices.  It argues, however, that the

---

131. Travelers' witnesses characterized employer-based programs, for example, as true affinity programs because employees likely believe that their employers "did their homework" in determining the best products to offer.  By contrast, Travelers argues that programs offered through an individual's credit card company (such as the policy Mr. Frezza obtained *via* Citibank), for example, do not necessarily carry the same implications (or "affinities").  Travelers has not, however, sought to break the Group Marketing SubClass into two distinct subclasses.

pricing model impacted only the commissions received by agents.  As to Travelers itself, it claims the model was "revenue neutral."  In fact, Travelers claims that the multi-priced structure grew out of requests from agents for lower-priced alternatives whereby they could sacrifice some of their commissions to provide more competitive prices (while still offering a Travelers product) and close sales that might otherwise be lost.  In other words, Travelers maintains that the "higher-priced" policies (Plaintiffs' term) were the norm until Travelers added the "lower-priced" alternative sold *via* an independent underwriting subsidiary.

Travelers maintains that, despite the policies being substantively the same in both sales channels, the group marketing channel is distinct from the retail channel because of various conveniences provided in connection with the group programs.  For example, often payments may be made *via* direct withdrawal from a paycheck or a bank account, a service which, in the retail channel, would likely cost a fee.  Travelers also suggests that "costs" to implement and maintain group marketing programs may impact pricing – *e.g.*, maintaining call centers.  In other words, according to Travelers, the prices offered *via* the retail and group marketing channels do not share an "apples to apples" relationship.  That notwithstanding, however, Travelers' witnesses admitted that Travelers does not disclose to program sponsors (and certainly not to program participants) that cheaper identical policies are available through the retail channel.  Tr. at 136-37.  Further, they admitted that program participants go through a substantially similar application process (*i.e.*, they provide the same information and review and complete the same forms) as individuals in the retail channel.  Tr. at 138.

Ultimately, Travelers contends (and Plaintiffs essentially do not dispute) that the practice of offering multiple prices (for the same policy) through multiple underwriting subsidiaries is not *per*

6

*se* unlawful.[12]  Plaintiffs simply challenge whether, *under the circumstances alleged*, Travelers was required to disclose to its customers that it was engaged in the practice.

## II.    FEDERAL RULE 23 – CLASS CERTIFICATION

Federal Rule of Civil Procedure 23 governs federal class certification proceedings.  In sum, Plaintiffs have the burden of proving that all of the relevant requirements of Rule 23 are satisfied. *Amchem Prods. v. Windsor*, 521 U.S. 591, 614 (1997).  While the Sixth Circuit reviews a district court's decision on class certification only for an abuse of discretion, a district court is to conduct a "rigorous analysis" of the requirements of Rule 23.  *Sprague v. General Motors Corp.*, 133 F.3d 388, 397 (6th Cir. 1998).  When doing so, a court should accept the governing complaint's allegations as true.  *Reeb v. Ohio Dept. Of Rehab. & Correction*, 81 Fed. Appx. 550, 555 (6th Cir. 2003).  "Ordinarily, a district court must determine the permissibility of class certification based upon information other than that which is in the pleadings although it may do so based on the pleadings alone where they set forth sufficient facts."  *Id.*  "In making such a determination, a district court may draw reasonable inferences from the facts before it."  *Id.* (citing *Senter v. Gen. Motors Corp.*, 532 F.2d 511, 520 (6th Cir.1976)).

Generally speaking, a court does not have the authority to conduct a preliminary inquiry into the merits of a suit to determine whether it may be maintained as a class action.  *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 178 (1974).  The Supreme Court has recognized, however, that many issues that arise in a Rule 23 analysis may be intimately involved with the merits of some claims –

---

[12]    This view is borne out in all of Travelers' papers, as well as its counsel's oral argument at the hearing.  In fact, the thrust of counsel's remarks at the conclusion of the hearing dealt with these general views.  If true (which is to say "if proven"), these views may assist Travelers in defending against Plaintiffs' claims; however, these factual issues ultimately have little bearing on the certification analysis.

the more complex the determinations, the more likely they are entangled with merits-based inquiries.

*Coopers & Lybrand v. Livesay*, 437 U.S. 463, 469 n. 12 (1978); *see also In re Initial Public*

*Offerings Securities Litigation*, 471 F.3d 24, 34-35 (2d Cir. 2006) (explaining that *Eisen's* directive

that courts not consider the merits has sometimes been taken out of context); *but see Reeb,* 81 Fed.

Appx. at 555 (Sixth Circuit in 2003 citing only to *Eisen*, *supra*, for the proposition that a district

court may not inquire into the merits).  Under such circumstances, therefore, district courts may be

compelled to address *certain* merits-based issues, but only for the *limited purpose* of determining

whether certification is appropriate under Rule 23.

A.      **Rule 23(a).**

Plaintiffs must show that they (and, as to certain requirements, the putative class) satisfy the

four prerequisites for certification outlined in Rule 23(a).  The rule provides:

> (a)      **Prerequisites.**  One or more members of a class may sue or
> be sued as representative parties on behalf of all members
> only if:
>
> > (1)      the class is so *numerous* that joinder of all members is
> > impracticable;
> >
> > (2)      there are questions of law or fact *common* to the class;
> >
> > (3)      the claims or defenses of the representative parties are
> > *typical* of the claims or defenses of the class; and
> >
> > (4)      the representative parties will fairly and *adequately*
> > protect the interests of the class.

FED. R. CIV. P. 23(a) (emphasis added).  These prerequisites generally are referenced as the

numerosity, commonality, typicality and adequacy of representation requirements.

B.      **Rule 23(b).**

Plaintiffs also must satisfy <u>at least one</u> of Rule 23(b)'s provisions.  *In re American Medical*

8

*Sys.*, 75 F.3d 1069, 1079 (6th Cir. 1996).  Here, Plaintiffs argue that certification is appropriate under

23(b)(3).[13]  In relevant part, Rule 23(b) provides:

> (b)     **Types of Class Actions.**  A class action may be maintained
>         if Rule 23(a) is satisfied and if:
>
>         . . .
>
>         (3)     the court finds that the questions of law or fact
>                 common to the class members *predominate* over any
>                 questions affecting only individual members, and that
>                 a class action is *superior* to other available methods
>                 for fairly and efficiently adjudicating the controversy.
>                 The matters pertinent to these findings include:
>
>                 (A)     the class members' interests in individually
>                         controlling the prosecution or defense of
>                         separate actions;
>
>                 (B)     the extent and nature of any litigation
>                         concerning the controversy already begun by
>                         or against class members;
>
>                 (C)     the desirability or undesirability of
>                         concentrating the litigation of the claim in the
>                         particular forum; and
>
>                 (D)     the likely difficulties in managing a class
>                         action.

FED. R. CIV. P. 23(b) (emphasis added).  Accordingly, Plaintiffs must demonstrate two things to

satisfy Rule 23(b)(3).  First, they must demonstrate that common questions of law or fact

predominate over individual questions.  Second, they must demonstrate that a class action is a

superior method of addressing the claims at issue.

---

[13]     While the governing complaint also references Rule 23(b)(2) (*see* Doc. 77 at ¶¶ 35
         and 44), Plaintiffs' oral and written submissions only address Rule 23(b)(3).  The
         Court's Rule 23(b) analysis, therefore, is limited to subsection (b)(3).

III.   **DISCUSSION**

According to Plaintiffs, "what we've got here is a failure to communicate." COOL HAND

LUKE (Warner Brothers Pictures 1967).  Plaintiffs claim that Travelers has defrauded the class not

simply because it offers identical policies at different prices, but because it:  (1) intentionally created

the possible (and likely) misimpression by the class that lower-priced policies do not exist; (2) then

failed to inform the class that such policies actually do exist (allegedly having a duty to do so at that

point); and (3) then sold higher-priced (but otherwise identical) policies to the class.  In other words,

Plaintiffs claim that misleading omissions imposed upon Travelers it a duty of full disclosure, which

it failed to honor.

Given the two channels by which Travelers' policies were sold, Plaintiffs propose <u>one class</u>

of persons in Ohio who purchased homeowners insurance from Defendants from March 7, 1998 to

the present, and who were eligible for identical coverage at a lower price.  Further, Plaintiffs propose

<u>two subclasses</u>.  First, they propose an "Agent Subclass" (*i.e.*, retail channel) represented by named-

Plaintiffs Neil Stanich and Bobbie Jean Stanich.  Second, they propose a "Group Marketing

Subclass" (*i.e.*, group marketing channel) represented by Plaintiff Dante Frezza.  Plaintiffs define

the proposed class and subclasses as follows:

*Class*

> All persons in Ohio who purchased a homeowners insurance policy
> from Travelers Indemnity Company, The Standard Fire Insurance
> Company, or any of their subsidiaries, affiliates or authorized agents,
> who were eligible to purchase Travelers homeowners insurance
> offering identical coverage and service, at a lower price, from March
> 7, 1998 to the present (the "Class Period").[14]

---

[14]     As they must, Plaintiffs confirm that the proposed class excludes "present and
former agents and employees of [Travelers] during the Class Period, any class

*Agent SubClass*

> All persons, not otherwise included in the Group Marketing SubClass, in the State of Ohio, who purchased homeowners insurance, between March 7, 1998 and May 18, 2003, from Travelers through an independent agent who were eligible to purchase identical insurance coverage from Travelers at a lower price.

*Group Marketing SubClass*

> All persons in the State of Ohio who purchased homeowners insurance, between March 7, 1998 and May 18, 2003, from Travelers through a group marketing program who were eligible to purchase an identical Travelers policy at a lower price.

As outlined above, Plaintiffs bear the burden of satisfying Rule 23(a) and, in this case, Rule 23(b)(3). Because they essentially agree that Rule 23(a)'s commonality requirement is satisfied (discussed further below), the parties focus on Rule 23(b)(3)'s predominance requirement first, and Rule 23(a)'s remaining requirements second. Given the Court's ultimate conclusions, addressing these subsections in reverse order has a logical appeal. Like the parties, therefore, the Court begins its analysis with Rule 23(b)(3).

For the reasons that follow, the Court finds that Plaintiffs <u>have satisfied</u> the predominance and superiority requirements of Rule 23(b)(3). Likewise, the Court finds that Plaintiffs <u>have satisfied</u> the numerosity and commonality requirements of Rules 23(a)(1) and (a)(2). As to Plaintiff Dante Frezza, moreover, the Court finds that Plaintiffs <u>have satisfied</u> the typicality and adequacy requirements of Rules 23(a)(3) and (a)(4). As to Plaintiffs Neil and Bobbie Jean Stanich, however, the Court finds that Plaintiffs <u>have not satisfied</u> the typicality and adequacy requirements of Rules

---

member who timely elects to be excluded from the class, all members of the judiciary of this Court, and members of their immediate families."  Doc. 109.

23(a)(3) and (a)(4).[15]

    **A.**    **The Basis for Plaintiffs' Fraud Allegations and Travelers' Alleged Duty to Disclose the Existence of Lower-Priced Policies.**

As footnoted above, this case was filed in response to the Court's dismissal of *Zangara*.  Of relevance to the class certification analysis, Plaintiffs here offer a new theory as to why Travelers had a duty to disclose the existence of lower-priced policies.  Whereas the fraud claim in *Zangara* was premised upon a purported duty *arising from an alleged fiduciary relationship between agents and consumers*, Plaintiffs here instead premise the same "duty to disclose" *on Travelers' alleged <u>partial disclosures</u> (i.e., omissions in standardized documents) and superior knowledge that created, or <u>might have created</u>, a misleading impression by consumers regarding how Travelers' policies were priced*.[16]  While it is possible that this theory adjustment ultimately may weaken Plaintiffs' ability to succeed on the merits, it clearly assists their class certification efforts because, as alleged, individualized facts (*e.g.*, interactions between agent and consumer) have no bearing on the creation of the alleged duty (*i.e.*, the duty derives from uniformly disseminated form documents).  As

---

[15]     Travelers does not challenge the adequacy of Plaintiffs' counsel.  The Court's adequacy finding, therefore, is limited to the Staniches.

[16]     Plaintiffs refer to this as liability based on a "possible misimpression."  *See Connelly v. Balkwill*, 174 F.Supp. 49 (N.D. Ohio 1959) ("[T]he law of Ohio imposes a duty to make full disclosure in those circumstances where such disclosure is necessary to dispel misleading impressions that are or might have been created by a partial revelation of the facts.").  While Travelers briefly attacks the validity of this legal theory, at the class certification stage, the Court is only permitted to address the merits of the putative class' claims if they overlap with its Rule 23 analysis.  *See In re Initial Public Offering Securities Litigation*, 471 F.3d 24, 39 (2d Cir. 2006) ("[T]he predominant view of other circuits [is] that class certification requires findings as to [Rule 23] requirements, even if such findings involve consideration of merits issues.").  The Court's analysis, therefore, takes this limitation into consideration and does not venture too far into the merits.

12

discussed *infra*, Travelers' attempts to inject "individualized inquiries" into the certification analysis are misplaced.[17]

Specifically, Plaintiffs argue that three uniformly used Travelers documents contain partial disclosures that "might" have created a misleading impression about pricing.  They are:

- Insurance Application – Travelers' application requests over 100 pieces of information from consumers.  Plaintiffs argue that the application creates the misimpression that:

    (1)  these are the only factors that go into determining a policy's price; and

    (2)  the agent plays no role in determining a policy's price. Further, Plaintiffs argue that every consumer is told by the agent that the information requested is for the purpose of establishing a price (*i.e.*, a reinforcement of the alleged implication flowing from the documents themselves).

- Insurance Policy – Plaintiffs allege that the policy is given to consumers prior to their first payment.  Each policy states that Travelers computes the price in accordance with applicable "rates and regulations," which Plaintiffs allege creates the misimpression that the agent plays no role in computing the price, and, likewise, cannot alter or negotiate it.  Similarly, Plaintiffs allege that this suggests that only a single price is available.

- Homeowner's Brochure – The brochure contains the statements that Travelers provides "maximum affordability," and that "the agent is working for you."  Plaintiffs contend these are misleading given that

---

[17]  For example, throughout its brief, Travelers argues that "individualized inquiries" abound in connection with a determination as to whether a fiduciary relationship arose between Plaintiffs and their agent.  *See e.g.*, Doc. 119 at pp. 25-27.  As noted, however, Plaintiffs do not argue that the duty to disclose arose out of an alleged fiduciary relationship.  As discussed *infra*, Travelers also argues strongly that individualized questions predominate with regard to the reliance element of Plaintiffs' fraud claim.  Again, however, Travelers' argument overlooks the nature of Plaintiffs' allegations.

neither Travelers, nor its agents, inform consumers of identical lower-priced policies.[18]

In addition to these standard documents, Plaintiffs argue that considerations unique to each subclass further support the creation of the alleged duty of full and fair disclosure.  As to the Agent SubClass, for example, Plaintiffs argue that its members are further mislead because independent agents are not authorized to negotiate prices.  If asked about the availability of a lower Travelers price, Plaintiffs allege that agents are trained not to disclose its existence.  As to the Group Marketing SubClass, Plaintiffs argue that its members are more likely to believe that they are receiving the lowest possible price simply because of their association (or membership) with the program through which their policy was provided – *i.e.*, limited access equates to preferred treatment.[19]

Plaintiffs further argue that Ohio and federal law permit an inference of uniform "reliance"

---

[18]  Plaintiffs admit that the brochure is not necessarily provided to all consumers; it is disseminated at agents' discretion.  Regardless, Plaintiffs maintain that Travelers' application and policy are sufficient to give rise to the alleged duty, even if the brochure is excluded.  Their theory relative to Travelers' duty to disclose (discussed *infra*), is that Travelers should have known that "partial" disclosures in its written materials were (or likely were) misleading consumers regarding Travelers' prices – *i.e.*, suggesting that only one price was available for a given set of risk factors.  Since Travelers admits that it did not know which consumers received the brochure (Tr. at 38 – Pillen testimony), Plaintiffs argue that an effort to resolve the possible misimpressions necessarily would have required a universal public clarification – *i.e.*, if you do not know who to tell, you must tell everybody.

[19]  As discussed in more detail below, Travelers contends, however, that the nature of the different "associational" relationships that exist among the group marketing programs presents critical "atypicality" distinctions.  For example, Travelers argues that an employee who buys insurance through a program offered *by his employer* likely will feel more secure in that transaction than a person who buys insurance through a program offered *by his credit card company*.

(as opposed to requiring individualized proof) by all class members on Travelers' alleged concealment of the existence of lower-priced policies because, under the circumstances alleged, it is reasonable to conclude that everyone would opt for a less expensive version of an otherwise identical policy.  This view gives rise to the principle debate at issue in these proceedings.

### B.    Federal Rule 23(b)(3).

Though Travelers does not concede the superiority requirement, it principally contests the predominance requirement.  For the following reasons, the Court finds that Plaintiffs have satisfied Rule 23(b)(3)'s predominance and superiority requirements.

#### 1.    Predominance.

As noted, the parties focus only on Plaintiffs' fraudulent concealment claim.  To sustain that claim under Ohio law,[20] Plaintiffs must establish that:

(1)    a representation or, where there is a duty to disclose, concealment of a fact;

(2)    which is material to the transaction at hand;

(3)    made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred;

(4)    with the intent of misleading another into relying upon it;

(5)    justifiable reliance upon the representation or concealment; and

(6)    a resulting injury proximately caused by the reliance.

*Cohen v. Lamko*, 10 Ohio St. 3d 167 (1984) (emphasis added).  The parties agree that only the first

---

[20]    The parties agree that Ohio law substantively governs Plaintiffs' claims.  As discussed below, they only disagree as to whether, or to what extent, Ohio law impacts the Court's analysis under Federal Rule 23.

and fifth elements are at issue here – *i.e.*, whether a duty to disclose arose uniformly across the class, and whether reliance can be uniformly established.  The extent to which (if at all) these elements present common questions of law or fact dramatically impact whether common questions predominate, as required by Rule 23(b)(3).

### a.  Element No. 1 – Duty to Disclose.

Plaintiffs' fraud claim alleges that Travelers concealed[21] pricing information that it had a duty to disclose *under the circumstances of this case*.  In the fraud context, Plaintiffs argue that Ohio law imposes a duty of full disclosure when such disclosure is necessary to cure misleading impressions that are, or might have been, created by a partial revelation of facts.  Among other cases, Plaintiffs cite *Bays v. Hunter Sav. Ass'n*, which states:

> Ohio law imposes a duty to make full disclosure in circumstances
> where full disclosure is necessary to dispel misleading impressions
> that are, <u>or might have been</u>, created by partial revelation of the facts.

539 F. Supp. 1020, 1025 (S.D. Ohio 1982) (citing *Connelly v. Balkwill*, 174 F. Supp. 49 (N.D. Ohio 1959), aff'd 279 F.2d 685 (6th Cir. 1959) (emphasis added).  *See also Equal Justice Foundation v. Deutsche Bank Trust Co. Americas*, 2006 WL 2795211 (S.D. Ohio 2006); *Blon v. Bank One*, 35 Ohio St. 3d 98, 101 (1998); *Munnings v. Alligood*, 1991 WL 161328 (Ohio Ct. App. 1991); *Walter v. Marion production Credit Association*, 537 N.E.2d 676 (Ohio Ct. App. 1987).

Plaintiffs posit the application, the policy and the brochure as the "partial facts" regarding price that Travelers uniformly disclosed in connection with the alleged scheme.  They allege that Travelers' duty arose class-wide (*i.e.*, irrespective of individual plaintiffs' actual impressions)

---

[21]  Plaintiffs claim is not premised on express representations; it falls under the "concealment" portion of the first element.

16

because <u>Travelers should have known</u> that its disclosures "might" mislead consumers to believe that the policies in question were available at only one price – the higher price.  In other words, Plaintiffs focus on Travelers' state of mind *vis-a-vis* the partial disclosures.[22]  Plaintiffs cite Section 529 of the Restatement (Second) of Torts, which provides in relevant part:

> A representation stating the truth so far as it goes <u>but which the maker knows or believes to be materially misleading</u> because of his failure to state additional or qualifying matter is a fraudulent misrepresentation.
>
> Comment:
>
> b.     Whether or not a partial disclosure of the facts is a fraudulent misrepresentation <u>depends upon whether the person making the statement knows or believes</u> that the undisclosed facts <u>might affect the recipient's conduct</u> in the transaction in hand.

Rest. 2d Torts § 529 (emphasis added).[23]  Accordingly, Plaintiffs argue that common questions predominate the "duty" inquiry.

Travelers, on the other hand, argues that the duty Plaintiffs allege can only be proved *via* individualized facts because applicable law[24] provides that only an <u>actual</u> misimpression can give

---

[22]    This is not to say that Plaintiffs believe the duty must arise in this way; Ohio law clearly allows for actual misimpressions to give rise to the duty.  Plaintiffs simply contend that Ohio law permits two avenues for the creation of the duty, otherwise the cases' use of the phrase "or might have been" is meaningless.

[23]    Plaintiffs also liken this analysis to that of a products liability "failure to warn claim," where the focus is on what the manufacturer knew – as opposed to the consumer.

[24]    It is not clear whether Travelers opposes Plaintiffs' application of Ohio law (as opposed to federal law), or whether it simply disagrees with Plaintiffs' reading of Ohio law.  After arguing that the Ohio cases cited by Plaintiffs are distinguishable, Travelers cites *Andersons, Inc. v. Consol, Inc.*, 348 F.3d 496 (6th Cir. 2003) as the "applicable, binding and relevant" law; it does not, however, expressly contend (as it does with regard to the "reliance" issue, *infra*) that federal law governs this portion of the Court's Federal Rule 23 analysis.

17

rise to a duty of full disclosure.  In other words, Travelers focuses *exclusively* on the recipient's

actual state of mind *vis-a-vis* the partially-disclosed facts.  Travelers cites no authority, however, in

support of this much narrower view of Ohio law.  It simply argues that Plaintiffs have "taken out of

context" some language in some "Ohio state court opinions."

Interestingly, the Sixth Circuit case Travelers cites as "applicable authority" includes a

revealing parenthetical description of Ohio law's view on this very issue.  Citing *Blon v. Bank One,*

*Akron*, 35 Ohio St. 3d 98 (1988), one of the cases Plaintiffs purportedly have taken "out of context,"

the Sixth Circuit summarized Ohio law as follows:

> (A party to a business transaction may have a duty of full disclosure
> "where such disclosure is necessary to dispel misleading impressions
> that" a "partial revelation of the facts" created or might have created.)

*Andersons, Inc. v. Consol, Inc.,* 348 F.3d 496, 507 (6th Cir. 2003) (emphasis added).  What is

interesting about this description is that it places the phrase "or might have created" at the end,

leaving little doubt that partial disclosures that created actual *or potential* misimpressions equally

may give rise to a duty to disclose.  At the hearing, Travelers also argued:

> You got to have a misimpression.  That's not optional.  The "might"
> [referenced in the cases cited by Plaintiffs] is with respect to whether
> or not it was the partial revelation of facts that was the creator or the
> cause of that misimpression.

Tr. at 339.  Travelers' strained grammatical argument, however, conflicts with even the Sixth

Circuit's summary of Ohio law, as provided in a case cited by Travelers.  Travelers' reference to

*Andersons* for the broad proposition that "the Sixth Circuit has explicitly recognized that the

misimpression theory being relied upon by Plaintiffs requires individualized proof" is misplaced, in

any event, because the case Travelers' quotes relates to the "reliance" element of fraud, which

presents an separate inquiry.  *See* Doc. 119 at p. 22.

18

Travelers' argument that Plaintiffs *absolutely* cannot establish that Travelers had a duty to disclose the existence of its pricing information without alleging (and proving) actual misimpressions by all Plaintiffs, therefore, is unconvincing given the argument and authorities presented.  Subject only to a more comprehensive merits-based analysis that may arise in future proceedings, the Court concludes that Plaintiffs sufficiently have demonstrated that the alleged duty can be established by resolution of common, and predominant, questions of law and fact.

### b.        Element No. 5 – Reliance.

The primary[25] predominance issue in this case is whether proving "reliance" presents the sort of individualized inquiries that precludes certification, or whether reliance may be presumed or inferred on a class-wide basis.  Plaintiffs argue that, *depending on the fraud alleged* (*i.e.*, in this case, fraudulent concealment in violation of a duty to disclose arising from partial disclosures *via* standardized documents), federal law and Ohio law alike *sometimes* permit class treatment.  Of course, Plaintiffs believe that the claims presented here qualify for class treatment.  Conversely, Travelers takes the position that, particularly in the insurance context anyway, class treatment is improper whenever reliance is an issue.  Tr. at 333-34.[26]

---

[25]    At the hearing, Travelers focused heavily on the reliance issue, arguing that it is dispositive.  It argued that, if the Court determined that the reliance element of Plaintiffs' fraud claim required individualized inquiries, the Court need not address any of the other Rule 23 requirements.

[26]    Travelers initially proposed a much broader proposition – that when reliance is in issue, class treatment is *never* permitted.  When pressed by the Court at the hearing, however, Travelers secondarily argued that, "in certain financial contexts," class treatment of fraud claims may be appropriate, but never in the insurance context.  In support of that view, Travelers stated only that the Sixth Circuit has yet to endorse a fraud class in the insurance context.  While it is admittedly difficult to prove a negative, it remains true that Travelers cited no affirmative authority in support of its position.

19

Albeit only briefly, the 1996 Advisory Committee Notes to Rule 23(b)(3) address this distinction.  In relevant part, they state:

> . . . a fraud perpetrated on numerous persons by the use of similar misrepresentations may be an appealing situation for a class action . . . On the other hand, although having some common core, <u>a fraud case may be unsuited for treatment as a class action if there was material variation in the representations made or in the kinds or degrees of reliance by the persons to whom they were addressed.</u> (emphasis added).

There is no question, however, that there was little or no "material variation" in the alleged <u>written</u> partial disclosures (*i.e.*, concealment or misrepresentation by omission) in this case because they were based on standardized form documents.[27]  The insurance application was an ACORD standard industry insurance application; the policy terms alleged to constitute "partial disclosures" were the same in all putative class members' policies; and the homeowners brochure distributed to the applicants was the same.[28]  The relevant portions of all of these documents (summarized *supra*) were substantially identical throughout the class period (though other portions may have changed).

Plaintiffs allege that all class members filled out an insurance application.  Randall Pillen, a Regional Agency Manager at Travelers, further testified that agents, "at the very least," informed

---

[27]  It is important to keep in mind that Plaintiffs have carefully limited the bases upon which the alleged duty rests.  They have not, for instance, asserted that particular agents or classes of agents affirmatively represented – orally or in writing – that only a single pricing structure existed.  Even if such representations were made, accordingly, Plaintiffs do not rely upon them in support of their fraud claim.  While Travelers may have a strong merits argument against the strength of the bases upon which Plaintiffs ground their claims, for certification purposes, the Court limits its analysis to the issues of commonality and predominance.

[28]  As noted, the parties agree that the brochure was not uniformly disseminated (*i.e.*, it was distributed at the agents' discretion).  While important, this fact is not fatal because sufficient other writings were uniformly disseminated.

customers that one purpose of the application was to determine price.  Plaintiffs also allege, and Travelers does not dispute, that all class members received their policy prior to making their first payment.[29]  The homeowners brochure presents a weaker example of a uniform partial disclosure because it was distributed "at the discretion of the agent," and both deposition and hearing testimony confirms that not all class members received the brochure.  Clearly, the application constitutes the best alleged example of a uniform misrepresentation (by omission) that all class members allegedly reviewed and completed prior to purchasing (or deciding to purchase) a Travelers policy.

Where there are uniform presentations of allegedly misleading information, or common omissions throughout the entire class, especially through form documents, courts have found that the element of reliance may be presumed class-wide, thereby obviating the need for an individualized inquiry of each class member's reliance.  In support of this proposition, Plaintiffs primarily cite three cases in which the Supreme Court of Ohio <u>reversed the denial of class certification in consumer fraud cases</u>. *Baughman v. State Farm Mut. Auto. Ins. Co.*, 88 Ohio St.3d 480 (2000); *Cope v. Metro. Life Ins. Co.*, 82 Ohio St.3d 426 (1998); and *Hamilton v. Ohio Savings Bank*, 82 Ohio St.3d 67 (1998).  In these cases, the Supreme Court of Ohio held that reliance was not an obstacle to class certification because reliance could be presumed or inferred where form documents, or standardized practices, formed the basis of the alleged fraud.  Two of those cases cite a footnote from a Sixth Circuit case in which the Court stated, in the fraudulent concealment context, "it must be inferred" that a bank's disclosure of a certain rate influenced the plaintiffs' decision to borrow money from the bank.  *Michaels Bldg. Co. v. Ameritrust Co., N.A.*, 848 F.2d 674, 679 n.8 (6th Cir. 1988).

---

[29]     Travelers argues that class members make their decision to purchase policies prior to actually receiving them, however.

Travelers argues that cases from the Supreme Court of Ohio addressing Ohio Rule 23 are not controlling here because the Court must apply federal law when performing a *federal* Rule 23 analysis.[30]  *Erie R.R.  v. Tompkins*, 304 U.S. 64 (1938) (in diversity cases, state law governs substantive inquiries and federal law governs procedural inquiries).  Because federal law likewise supports the Supreme Court of Ohio's reasoning in *Baughman, Cope* and *Hamilton* (outlined further below), refusing to apply Ohio law here is of little consequence.[31]  Believing the contrary, Travelers cites several federal cases for the proposition that, in the context of a fraud or estoppel case, "reliance" always presents an individualized inquiry and always prevents class certification.  *See Sprague v. General Motors Corp.*, 133 F.3d 388 (6th Cir. 1998); *Stout v. J.D. Byrider*, 228 F.3d 709 (6th Cir. 2000).

---

[30]     Of note, OHIO RULE OF CIVIL PROCEDURE 23 (which governs certification of class actions in Ohio) is <u>identical</u> to Federal Rule 23.  Further, the Supreme Court of Ohio <u>relied on federal law</u>, and even quoted the Advisory Committee Note to the 1996 amendment to Federal Rule 23, in reaching the conclusions outlined above.

[31]     The Court declines Travelers' invitation, therefore, to engage in a lengthy analysis of whether the Court is permitted to rely on Ohio law in connection with its Rule 23 analysis in this context (*i.e.*, relative to a substantive element of a state law claim for fraud).  While Travelers reference to the *Erie* doctrine has facial appeal, the Court is not convinced that it completely obviates the relevance of Ohio law here.  Of note, Travelers does not raise the *Erie* doctrine in connection with the "duty" analysis (where Ohio law *arguably* was less clear).

The parties' "additional authority" briefing (Docs. 122 and 126) also is dedicated *exclusively* to this issue, though from the perspective of FED. R. EVID. 302.  As an additional basis for the Court to follow cases from the Supreme Court of Ohio regarding presumed (or inferred) reliance, Plaintiffs cited Rule 302 at the hearing for the proposition that, when federal law governs the effect of a presumption in a diversity case where the presumption relates to the element of a claim (*i.e.*, reliance here), state law determines whether, and under what circumstances, the presumption exists.  Again, because federal law supports the same result (that reliance may be presumed across the class), the Court need not resolve these heavily briefed issues.

22

The concept that "reliance" in a fraud-based class action can be established by presumption or inference is not unique to Ohio law.  In circumstances like those presented here (as opposed to the circumstances in the cases Travelers cites), federal courts understandably have endorsed the concept.  For example, in *Klay v. Humana, Inc.*, 382 F.3d 1241, 1259 (11th Cir. 2004), the Eleventh Circuit, in a massive class action of "almost all doctors versus almost all major health maintenance organizations (HMOs)," affirmed the certification of a class of physicians asserting fraud-based RICO claims against HMOs, finding that the plaintiffs could prove  reliance on a class-wide basis using common evidence.[32]  The alleged misrepresentations were that the HMOs would reimburse doctors for all medically necessary services.  *Id.*  The *Klay* court held that circumstantial evidence leading to legitimate inferences "could lead a reasonable factfinder to conclude beyond a preponderance of the evidence that each individual plaintiff relied on the defendants' representations."  *Id.*  The court explained that, "[i]t does not strain credulity to conclude that each plaintiff, in entering into contracts with the defendants, relied upon defendants' representations and assumed they would be paid the amounts they were due.  A jury could quite reasonably infer that guarantees concerning physician pay – the very consideration upon which those agreements are based – go to the heart of these agreements, and that doctors based their assent on them."  *Id.*[33]

---

[32]    The court reversed the district court's certification of the class' state law claims, however, for a variety of reasons not related to the element of reliance.

[33]    Other federal courts have reached similar conclusions.  *See In re American Continental Corp./Lincoln Savings & Loan Securities Litigation*, 140 F.R.D. 425, 430 (D. Ariz. 1992) (certifying a class alleging, among others, state law claims for fraudulent misrepresentation, finding that "[i]f a court finds that a reasonable man would have relied upon the alleged misrepresentations, an inference of justifiable reliance by each class member would arise.") (quoting *Vazquez v. Sup. Ct. Of San Joaquin County*, 4. Cal.3d 800, 805 (Cal. 1971)).

The cases Travelers cites for the broad proposition that fraud "reliance" <u>always</u> presents individualized inquiries fatal to class certification are factually distinguishable.  Indeed, Plaintiffs do not contend that reliance may always be inferred across a class (clearly that is not the case); they simply contend that it can be done here due to the nature of their allegations.  In *Sprague v. General Motors Corp.*, 133 F.3d 388 (6th Cir. 1998), the Court held that estoppel claims were not susceptible to class treatment in an ERISA action where plaintiffs alleged that their employer made oral and written representations to them about their benefits upon taking early retirement.  In that case, the Court expressly held that "GM's statements to the early retirees were <u>not uniform</u>" because they varied based on the person making the representation, the particular retirement program, the facility where the employee worked, and the period during which the representations were made.  *Id.* at 398

--------

In fact, even oral representations have been found sufficiently uniform to certify a fraud class when it can be demonstrated that they were made pursuant to a "standardized sales pitch" or were recited verbatim from a script or from memory. For example, the Ninth Circuit found the required degree of uniformity among misrepresentations in a class action for fraud against agents who sold "sub-prime" mortgage rates to targeted consumers. *In re First Alliance Mortgage Co.*, 471 F.3d 977, 991 (9th Cir. 2006).  In that case,  there was evidence of a scheme to mislead borrowers through "a standardized protocol the sales agents were carefully trained to perform," including a "script that was required to be memorized and strict adherence to a method of hiding information and misleading borrowers." *Id.*; *see also Davis v. So. Bell Telephone & Telegraph Co.*, 158 F.R.D. 173, 176 (S.D. Fla. 1994) (certifying class alleging fraudulent misrepresentations <u>by concealment</u>, where there was evidence that a telephone company's sales agents relied upon written scripts in making oral sales presentations.); *In re American Continental Corp./Lincoln Savings & Loan Securities Litigation*, 140 F.R.D. 425, 430 (D. Ariz. 1992) (finding oral misrepresentations to bond purchasers to be sufficiently uniform for class treatment even though they were not "identical.").  Allegations that, as a general practice, independent agents falsely represented to class members (or class members were otherwise misled by the standard marketing process) that the insurance application was the primary basis for determining price may likewise be sufficiently uniform to justify certification of a fraud class.

(emphasis added). *Sprague*, therefore, did not involve the same type of uniform alleged misrepresentations (by omission or otherwise) at issue here.

Similarly, in *Stout v. J.D. Byrider*, 228 F.3d 709 (6th Cir. 2000), the Sixth Circuit held that it was not an abuse of discretion for the district court to deny class certification for a putative class alleging, among other things, fraud against a used car dealership for misrepresentations relating to purchase and finance contracts. In so holding, the Court explained that the fraud (and other) claims required "an individual assessment of what documents the customer reviewed and in what manner, what representations Defendants made to each customer, and whether the customer selected the extended service agreement." *Id.* at 718. First, the procedural posture and the deferential standard of review alone distinguishes *Stout*. Second, the factual considerations identified by the Court in that case are simply not present here, especially if the Court considers only the insurance application, which every class member undisputedly reviewed and completed.

Likewise, Travelers cites two district court cases in which there was no evidence of a uniform presentation, standardized sales pitch, or form documents containing a misrepresentation or omission (*i.e.*, alleged partial disclosure). *See Keyes v. Guardian Life Ins. Co. of America*, 194 F.R.D. 253, 256-57 (S.D. Miss. 2000) (finding that defendant did not employ a "sales force," did not train the agents, did not provide them a script, and did not provide them a standardized sales pitch); *In re Hartford Sales Practices Litigation*, 192 F.R.D. 592, 606 (D. Minn. 1999) ("The oral representations of each individual agent - - as well as each Plaintiff's reliance thereon – will necessarily vary from Plaintiff to Plaintiff, from sales agent to sales agent, and from incident to incident.").

On its face, another case Travelers cites appears to support its argument. In *Sikes v. Teleline, Inc., USA*, 281 F.3d 1350, 1361-62 (11th Cir. 2002), the Eleventh Circuit rejected an argument that

reliance could be presumed in determining whether certification of a class alleging fraud-based RICO claims was appropriate. In that case, putative class plaintiffs alleged that an automated 900-number "Let's Make A Deal" game constituted illegal gambling perpetrated through wire and mail fraud in the advertisement and solicitation of calls. *Id.* at 1356. The Court, relying on prior Eleventh Circuit precedent, held that reliance could not be presumed and must be shown on an individual basis. *Id.* at 1361. The Court reasoned that presumptions generally benefit the party who does not have control of the evidence, and, in the case of a fraud class, the plaintiffs are the only ones who have evidence of reliance. *Id.* at 1362.[34]

While *Sikes* no doubt supports Travelers' view, it has been limited by *Klay*, *supra*. In *Klay*, decided two years after *Sikes*, the Eleventh Circuit specifically stated that, "[u]nder well-established Eleventh Circuit precedent, the simple fact that reliance is an element in a cause of action is not an absolute bar to class certification." *Klay*, 382 F.3d at 1258. It went on to distinguish the "presumed" reliance rejected by *Sikes* from the ability of a class to prove reliance based on common evidence, such as circumstantial evidence that creates legitimate inferences based on the nature of the alleged misrepresentations. *Id.* at 1259. It appears, therefore, that the holding in *Sikes* is not nearly as broad as it appears on its face (and certainly not as broad as Travelers advocates). It does not persuade this Court, in any event, that federal law absolutely prohibits presumed reliance *vis-a-vis* fraud class actions, as Travelers suggests. The cases (federal or otherwise) upon which Travelers relies are distinguishable.

Because Plaintiffs allege a duty to disclose arising from omissions in <u>standardized, form</u>

---

[34]    The Court also distinguished securities-fraud cases in which reliance is presumed because those cases presume reliance on a "fraud-on-the-market" theory. *Id.* at 1363.

documents, especially the insurance application, they allege a set of uniform disclosures that are not materially varied. As permitted under state (Ohio) and federal law, a fact-finder could reasonably infer that the class members' purchase of the insurance after completing the insurance application constitutes proof of reliance (on the disclosures in the application) that is common to all class members. Common questions, therefore, predominate with regard to Plaintiffs' fraud claim, and the proposed class is not barred by the requirements imposed by Rule 23(b)(3).

### 2. Superiority.

In finding that a class action is a superior method of adjudicating a controversy, the Court must balance the fairness and efficiency of the class action against, among other things, alternative forms such as individual lawsuits, consolidation or proceedings before a governing administrative body. Rule 23(b)(3) identifies a variety of factors the Court should consider:

(1)     class members' interests in individually controlling the prosecution or defense of separate actions;

(2)     extent and nature of any litigation concerning the controversy already begun by or against class members;

(3)     desirability or undesirability of concentrating the litigation of claims in a particular forum; and

(4)     likely difficulties in managing a class action.

FED. R. CIV. P. 23(b)(3).[35]  Given that individual damages, if established, probably amount to *relatively* small sums (*i.e.*, tens or hundreds of dollars), the individual class members in this litigation

---

[35]     Other factors include: (1) whether a class action would promote uniformity of decisions as to questions of law or fact; (2) whether a class action would protect the rights of persons who might not otherwise be able to bring individual claims; (3) whether a class action would compromise the fairness or truth-seeking process of trying each member's claim individually.

likely have little interest in pursuing claims individually.  The Court is unaware of any other actions commenced by, or against, members of the class, so there does not appear to be a legitimate risk of duplicative (and, therefore, possibly inconsistent) litigation.  The Court does not anticipate any unusual difficulties managing this class action.  These factors weigh *heavily* in favor of a class action being a superior method of adjudicating Plaintiffs' claims.

Travelers presents only a brief argument challenging superiority.  It argues that the existence of a regulatory body or agency that provides oversight of the subjects in issue – in this case, the Department of Insurance ("DOI") – favors a finding that this Court is not the superior forum within which these claims should proceed.  Travelers cites two cases in support of its view.  *Kamm v. California City Dev. Co.*, 509 F.2d 205 (9th Cir. 1975) and *Chin v. Chrysler Corp.*, 182 F.R.D. 448 (D.N.J. 1998).  Plaintiffs argue that *Kamm* and *Chin* are distinguishable.[36]  More to the point, though, they argue that pursuit of an administrative remedy here would be inefficient and a waste of resources because either party could go through the entire process, only to then have to resort to the court system if (1) an appeal is pursued, or (2) if Plaintiffs succeed and Travelers were to violate an administrative order.  Further, Plaintiffs argue that it is not clear that the DOI would apply Ohio's common law regarding fraud – as would this Court – in reviewing Plaintiffs' claim, or what recoveries would result from a successful administrative resolution.

---

[36]  Plaintiffs argue that both cases have no bearing here because they involved analyses being performed <u>after</u> settlements or remedies were already in place.  Moreover, they involved national class actions, and *Chin* involved product defects that, as to many class members, had not yet manifested or caused harm.  182 F.R.D. at 464.  Conversely, this case involves a proposed Ohio class and uniform (and defined) alleged harms.  These distinctions notwithstanding, given the circumstances of this case, *Kamm* and *Chin* have little impact on the Court's conclusions in any event.

28

The Court certainly considers the availability of an administrative forum when making its superiority determination.  The issues here, however, relate to whether the alleged scheme is fraudulent, which is not within the exclusive expertise of the DOI.  The complexity of the issues presented in the present motion alone demonstrates that a court likely is better suited to determine the manner by which the alleged claims will be resolved.  This case does not relate to whether the prices at issue were reasonable, or even whether Travelers' practice of offering multiple prices (disclosure issues, which are based on common law principles, aside) is lawful.  This is a fraud case for damages, addressing the manner in which Travelers implemented its sales, which this Court is best suited to hear.

Also, as the Court noted at the hearing, the claims at issue also do not relate to ongoing conduct; they relate only to past conduct by Travelers.  Travelers concedes that this makes the case less amenable to the DOI's administrative process, but observes that other companies may presently be engaged in conduct similar to that at issue here.  Such conduct by other companies is not at issue in this case, however.  For these reasons, the Court concludes that the judicial system is the superior forum within which Plaintiffs should pursue their claims.

### C.    Federal Rule 23(a).

Plaintiffs must also satisfy the prerequisites outlined in Rule 23(a).  The Court only briefly addresses the numerosity and commonality requirements because the parties have made clear that those requirements essentially are not in dispute.  The heart of the parties' disagreement relates to the typicality and adequacy requirements – as they relate to the named Plaintiffs only.  For the following reasons, the Court finds that Plaintiffs have satisfied Rule 23(a)(1) and (2)'s numerosity and commonality requirements.

With regard to the typicality and adequacy of the Staniches, the Court finds that defenses *unique to them* sufficiently call into question their ability to serve as proper class representatives. Because these concerns derive from the existence of defenses likely applicable only to the Staniches (as opposed to symptomatic issues across the class), however, the Court concludes that the interests of the putative class are best served if new representatives proceed on behalf of the class (*see* Section IV *infra*), which the Court otherwise finds suitable for certification. With regard to the typicality and adequacy of Dante Frezza, the Court finds that Plaintiffs have satisfied Rule 23(a)(3) and (4).

### 1. Numerosity and Commonality – Rules 23(a)(1) and (a)(2).

During a discovery dispute conference with the Court, the parties stipulated that the numerosity requirement is satisfied because it is clear that the proposed class likely includes hundreds, if not thousands, of individuals. *See* Doc. 36. The Court's rigorous analysis, therefore, need not include this requirement. Accordingly, the Court summarily finds that Plaintiffs have satisfied Rule 23(a)(1).

While not through a formal stipulation, the parties essentially agreed in their oral and written submissions that Rule 23(a)(2)'s commonality requirement also sufficiently is satisfied. The Court specifically clarified at the hearing that Travelers is not "heavily disputing" the question of commonality; rather, that Travelers only question is whether the obviously common issues predominate. *See* Tr. at 332. Clearly, common issues of law and fact are presented. As outlined above, the parties' primary disagreement relates to whether those common questions "predominate" over individualized questions. Accordingly, the Court need only briefly addresses this requirement.

The commonality requirement demands that there be "questions of law or fact common to the class." FED. R. CIV. P. 23(a)(2). The commonality test "is qualitative rather than quantitative[;]

30

that is, there need be only a single issue common to all members of the class." *American Medical Sys.*, 75 F.3d at 1080, *quoting* 1 Herbert B. Newberg & Alba Conte, *Newberg on Class Actions*, §3.10, at 3-47 (3d ed. 1992). *See also Sprague v. GMC*, 133 F.3d 388, 397 (6th Cir. 1998), *cert. denied*, 524 U.S. 923 (1998). Thus, although individual differences in issues among putative class members are relevant to the commonality inquiry, such differences do not necessarily defeat commonality. *See Sterling v. Velsicol Chem. Corp.*, 855 F.2d 1188, 1196–97 (6th Cir. 1988); *Senter v. General Motors Corp.*, 532 F.2d 511, 523–24 (6th Cir. 1976), *cert. denied*, 429 U.S. 870 (1976). The Court must be mindful, however, of the purpose underlying the commonality requirement – that "the class-action device save[] the resources of both the courts and the parties by permitting an issue potentially affecting every [class member] to be litigated in an economical fashion under Rule 23." *Califano v. Yamasaki*, 442 U.S. 682, 701 (1979). Thus, if questions of law or fact common to all of the class members are far outweighed by differences, then class certification should be denied.

Plaintiffs argue that there is commonality as to both legal and factual questions in this case. For example, they argue that the following common questions (of law and fact) exist in this case:

- Whether the Defendants implemented a scheme designed to conceal the availability of lower-priced Travelers homeowners insurance policies;

- Whether, from the Defendants' perspective, the Defendants' conduct "might have led to a misleading impression" regarding the Defendants' pricing, such that the Defendants had a duty to disclose to consumers the existence of lower-priced policies;

- Whether the Defendants induced their authorized agents to conceal from consumers the lowest available price for the Defendants' homeowners insurance;

- Whether the Defendants failed and refused to train, supervise, monitor and discipline their authorized agents who concealed from consumers the lowest available price for the Defendants' homeowners

31

insurance;

• Whether the conduct of the Defendants, as described in the Plaintiffs First Amended Class Action Complaint, supports Plaintiffs claims for fraud and unjust enrichment; and

• Whether the Class is entitled to compensatory and punitive damages, injunctive relief, or other equitable relief against Defendants.

Travelers does not argue that commonality is lacking; it simply argues that the most important questions must be resolved on an individual basis – *i.e.*, whether a duty to disclose the lower price arose as a result of actual misimpressions by each class member, and whether each class member <u>relied</u> on statements or omissions made by Travelers. Obviously, these issues are resolved in the Court's Rule 23(b)(3) analysis above. Travelers does not attack directly any of Plaintiffs' arguments that sufficient common issues of law and/or fact exist among the putative class members. The Court finds, therefore, that sufficient common questions of law or fact exist to satisfy Rule 23(a)(2).

## 2. Typicality and Adequacy – Rules 23(a)(3) and (a)(4).[37]

A claim is typical if "it arises from the same event or practice, or course of conduct, that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory." *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1082 (6th Cir.1996). "Typicality determines whether a sufficient relationship exists between the injury to the named plaintiff and the conduct affecting the class, so that the court may properly attribute a collective nature to the challenged

---

[37] The primary questions relating to typicality and adequacy "tend[] to merge" because both look to potential conflicts and to "whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 626 n.20 (1997). Accordingly, as did the parties, the Court addresses these requirements jointly.

32

conduct." *Sprague v. General Motors Corp.*, 133 F.3d 388, 399 (6th Cir. 1998).  The typicality requirement is not satisfied when a plaintiff can prove his own claim but not "necessarily have proved anybody else's claim." *Id*.  For the district court to conclude that the typicality requirement is satisfied, "a representative's claim need not always involve the same facts or law, provided there is a common element of fact or law." *Senter v. Gen. Motors Corp*., 532 F.2d 511, 525 n. 31 (6th Cir.1976).

"The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591 (1997) (internal quotation marks and citations omitted).  "A class representative must be part of the class and possess the same interest and suffer the same injury as the class members." *Id*.  Also, courts "review[] the adequacy of class representation to determine whether class counsel are qualified, experienced and generally able to conduct the litigation . . . ." *Stout v. J.D. Byrider,* 228 F.3d 709, 717 (6th Cir. 2000).  The "adequacy" inquiry, therefore, is directed to the named representatives and their counsel.

Courts have held that unique defenses bear on both the typicality and adequacy of a class representative. *See e.g., Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176, 180 (2d Cir.1990) ("Regardless of whether the issue is framed in terms of the typicality of the representative's claims . . . or the adequacy of its representation . . . there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it.").[38]  The challenge presented by a defense unique to a class representative, therefore, is that the

---

[38]     *See also J.H. Cohn & Co. v. Am. Appraisal Assocs*., 628 F.2d 994, 999 (7th Cir.1980) ("[T]he presence of even an arguable defense peculiar to the named plaintiff or a small subset of the plaintiff class may destroy the required typicality

representative's interests might not be sufficiently aligned with those of the class because he might be forced to devote time and effort to the defense at the expense of issues that are common and controlling for the class. *Id.* at 180 ("[T]here is a danger that . . . the class will suffer if [a] representative is preoccupied with [unique] defenses."). A class representative should "not be permitted to impose such a disadvantage on the class." *Koos v. First Nat'l Bank of Peoria*, 496 F.2d 1162, 1165 (7th Cir. 1974).[39]

There is no issue with regard to the adequacy of class representation in this case. The Court is quite familiar with the attorneys and firms who have appeared on Plaintiffs' behalf, all of whom are well-qualified, experienced and capable of conducting class action litigation. Travelers does not contest the adequacy of class representation. Accordingly, the Court finds that, with respect to representation of the proposed class, Rule 23(a)(4) is satisfied.

### a. Agent SubClass.

Plaintiffs Neil and Bobbie Jean Stanich are the proposed representatives for this subclass. Plaintiffs summarily argue that the Staniches' claims are typical because the Staniches purchased insurance through Standard Fire when they were eligible for a lower-priced Travelers policy, which they would have obtained if they had been aware of its existence. Travelers presents four arguments as to why (1) the Staniches' claims are not typical of those of the proposed class, and (2) the

---

of the class as well as bring into question the adequacy of the named plaintiff's representative.").

[39]    Commentators agree. *See* 7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure, § 1764 (3d ed.2005) (noting securities class actions in which a unique defense defeated typicality); *id.* at § 1765 (citing cases in which a unique defense defeated adequacy of representation); 5 James Wm. Moore *et al.*, Moore's Federal Practice § 23.24[5] (3d ed.2006) (typicality); *id.* at § 23.25[2][b] [iv] (adequacy of representation).

Staniches are inadequate representatives.

           **1.**       **Travelers Argues that the Staniches' Agent Was Unaware of the Availability of Lower-Priced Travelers Policies.**

Travelers argues that the Staniches could not have relied on the alleged concealment (and ultimately are not class members as a result) because John Swartz, the authorized agent who sold them[40] their policy, was unaware of a lower-priced Travelers alternative.[41]  This argument is a red herring because Swartz's knowledge – and its impact, if any, on the Staniches' decision making – is irrelevant to the issues at hand.

First, that their agent was unaware he could quote a lower price for an identical policy does not defeat the Staniches' claims because the proposed class is defined only as those who were <u>eligible</u> for a lower-priced policy.  The proposed class definition does not require that class members could have <u>actually received</u> the lower price (which logically would require an agent who knew it was available).  Second, the fraud alleged here is not premised on interactions with (or representations by) agents; they are premised on standardized documents provided by Travelers (though through agents) that might have led to the misimpression that only a single price was offered.  Regardless, even if Swartz had known of the existence of the lower-priced policy, Pillen testified that an agent would not reveal that he could quote a lower Travelers' price even if asked point-blank if one was available (which it to say that Travelers' policy was for the agent not to disclose it).  Tr. at 29.  It makes little difference, therefore, whether Swartz actually knew he could

---

[40]      Elsewhere, Travelers attacks who "them" actually is – *i.e.*, Neil Stanich and his ex-wife, Michelle Hunter, initially acquired the underlying policy.

[41]      Plaintiffs do not challenge Swartz's knowledge, or lack thereof.  They simply contest the view that his knowledge is relevant to the Court's analysis.

do so.  Accordingly, this argument does not render the Staniches atypical or inadequate.

> **2.      Travelers Argues that Neil Stanich Lacks Standing Because His Non-Party Ex-Wife Actually Purchased The Policy and Had All of the Meaningful Exposure to the Alleged Partial Disclosures.**

This argument has two components.  First, Travelers argues that the Staniches (particularly Mr. Stanich) <u>did not pay</u> for the policy in question; therefore, they have no claim ("payment argument").  Second, and more importantly with regard to the ability to allege fraud, Travelers argues that Neil Stanich's <u>limited involvement</u> (and Bobbie Stanich's arguable lack of involvement entirely) in the initial decision-making process renders him atypical and inadequate because he was not privy to the alleged omissions upon which Plaintiffs' claims are based ("minimal input argument").  Though legitimate criticisms, and good fodder for cross-examination, these arguments *alone* do not render the Staniches atypical or inadequate as defined by Rules 23(a)(3) and (a)(4).

Travelers' *payment argument* is simply unconvincing.  Essentially, it argues that Neil Stanich is inadequate because his ex-wife, Michelle Hunter, literally paid for the policy at issue.[42]  At best, this is arguably only half true.  Mr. Stanich explained at the hearing that the policy was paid for *via* the couple's home mortgage (to which he contributed), which is to say that a portion of every mortgage payment was set aside to pay for the policy.  Upon their divorce in July 1998, he explained that the couple "had an agreement" whereby Ms. Hunter would pay for some bills, and Mr. Stanich

---

[42]      Travelers presents the related argument that Bobbie Stanich is inadequate because she is not even a named insured on the policy.  Mrs. Stanich testified at her deposition that her name was never on the policy, yet at the hearing she testified that she believed her name was added at some point (she just did not remember when).  Regardless, she also testified that she has been married to Neil Stanich since 2000.  As Plaintiffs' counsel highlighted at the hearing, the policy defines "you" and "your" (as used in the policy) as the named insured and the insured's spouse, if resident of the same household.

would pay for others.  Ms. Hunter was responsible for the insurance bill.[43]  As a result, she remained the named insured on the policy for some time following the couple's divorce.  While susceptible to criticism, these facts do not foreclose Mr. Stanich's standing, or his adequacy to be a class representative.

Travelers' *minimal input argument*, on the other hand, presents a much closer call.  Travelers argues that Michelle Hunter made all discretionary decisions in connection with the insurance matters (and particularly with regard to the policy at issue here).  In other words, Travelers argues that she – and not the Staniches – interacted with the documents from which Plaintiffs argue misimpressions might have arisen.  While Mr. Stanich testified that he provided substantial input to Ms. Hunter with regard to the information she ultimately included on the application (*e.g.*, history and condition of the home, location, etc.), he readily admitted that he was not "in charge" of the insurance.

Alone, it is unlikely that this argument would render the Staniches atypical and inadequate because, to some extent, the defense (that one member of a marriage was more knowledgeable or involved than another – though both are "insureds") may be a relatively uniform circumstances across the class.  This story, however, contains the twist of a divorce where the "informed" member of the former union (who is not the purported class representative), per an agreement, continued to pay (and renew) the policy.  This twist, when considered in conjunction with the fact that the Staniches' initial purchase was not through Travelers to begin with (discussed *infra*), poses a significant concern with regard to the typicality of the Staniches' claims, and likewise their adequacy

---

[43]     As to the insurance premium paid in August 1998 (shortly after the divorce), Mr. Stanich made clear that the escrow money used to pay the premium consisted of his money as well – *i.e.*, pre-divorce contributions to mortgage payments.

to serve as class representatives.

As noted, the Court must guard against allowing unique defenses assertable against the named representatives to detract from their ability effectively to represent the class.[44]  Similarly, it must be mindful of the danger that the class may also unnecessarily suffer if a representative is preoccupied by a defense unique to him, or if the focus of the litigation may be distorted by the presence of such a defense.  A class representative should "not be permitted to impose such a disadvantage on the class." *Koos,* 496 F.2d at 1165.  *Taken in conjunction with the other arguments outlined below*, these issues prevent satisfaction of Rule 23(a)(3) and (4).

>    **3.    Travelers Argues that the Staniches Renewed Their Policy After Learning of the Alleged Fraudulent Scheme – *i.e.*, Ratification.**

In their brief, Travelers argues that the Staniches' claims (and Frezza – discussed separately below) are atypical because they renewed their policies after learning of the alleged factual bases for their claims.  As to the Staniches, Travelers did not focus on this argument at the hearing; indeed, counsel's argument did not even address it.  This is perhaps because the relevant deposition testimony on this topic was clarified at the hearing.  When asked when he last renewed his Travelers homeowners policy at his deposition, Neil Stanich testified that he was not really sure of the exact date, but that he thought it was in early 2006.  This issue was revisited at the hearing, and Mr. Stanich testified that his deposition testimony was inaccurate; he had confused the "renewal" date with the "cancel" date.  When asked at the hearing what he did with the Travelers policy in February

---

[44]    In this regard, it is important to note that Travelers does not argue that the defenses asserted against the Staniches are symptomatic across the class – *i.e.*, that no putative class member would be adequate to represent the class.  It simply argues that *these* representatives have problems.

2006, Mr. Stanich testified, "I canceled it." Tr. at 88.  The evidence in the record is that the Stanichs "learned" of the alleged scheme on or about February 20, 2006 – *i.e.*, after they had canceled their policy.

Accordingly, and likely the reason Travelers did not argue this issue further at the hearing, Travelers' renewal argument seemingly goes nowhere; therefore, it does not sufficiently destroy typicality or adequacy.[45]

### 4. The Staniches' Initial Policy Was Not Through Travelers.

Generally, Travelers argues that the Staniches are not proper representatives because the policy that led to their relationship with Travelers was not *initially* purchased from Travelers; it was purchased through a subsidiary of Aetna, Inc. ("Aetna"), with whom Travelers merged about a year after the purchase.  As a result, the Staniches essentially inherited Travelers, thereafter *renewing* their "former-Aetna-now-Travelers" policy from year to year.[46]  Arguing that "renewals" are materially different from "initial purchases" (*i.e.*, in terms of who is making disclosures – partial or misleading or otherwise), Travelers contends that the Staniches' renewal-based claims are not typical of the class members' purchase-based (from Travelers itself) claims.  There is no dispute as to these facts.  The

---

[45]     Travelers cites *Am. Nursing Care of Toledo, Inc. v. Leisure*, 609 F. Supp. 419, 427-28 (N.D. Ohio 1984), for the general proposition that certain conduct (*e.g.*, renewal, in this case) subsequent to learning of the alleged falsity of representations constitutes waiver and ratification, thereby limiting a claim for fraud.  Of note, the Supreme Court of Ohio, in *Baughman, supra,* addressed this very issue when analyzing the fraud claim at issue in that case.  It stated, "we reject the proposition that a finding of typicality is precluded whenever the class representative's reliance on the alleged misrepresentation is called into question." 88 Ohio St. 3d 480, 487 (2000).

[46]     Given the proposed Agent SubClass definition, the relevant years are 1998 to 2003 (*i.e.*, the years during which Travelers sold policies at multiple prices).

parties only debate their impact, if any, on the Rule 23(a)(3) and (4) analysis.

Plaintiffs first argue that there is no material difference between an initial purchase and a renewal purchase, such that typicality is not in issue.  They argue that both transactions yield new contracts; and both require applicants to complete applications, or at least review (and update) historical application information.[47]  Second, in the event there is a difference, Plaintiffs argue that the "initial" experience with Aetna (which the Staniches had) was substantially the same as an initial experience they would have had with Travelers.

Clearly, this is the strongest of Travelers' arguments.  As the Court noted at the hearing (*see* Tr. at 311), if Plaintiffs want the Court to assume that partial disclosures gave rise to possible misimpressions, it is significant that there at least be a likelihood that a class representative actually saw the disclosures in issue within the same (or similar) context as the class.  Here, not only did Mr. Stanich have limited involvement in acquiring the initial policy (*see* above), Travelers was not involved at all in that initial process (*i.e.*, through its documents).  The Court finds this distinction, which appears to be unique to the Staniches, fatal to their ability properly to represent the class, especially when considered in conjunction with some of the lesser (though still meaningful) arguments outlined above.  Plaintiffs' view that an experience with Aetna was materially identical to an experience with Travelers (*i.e.*, due to similarity of form documents and procedure), while perhaps accurate, still poses a unique threat.  Allowing that threat to proceed is not in the best interests of the putative class.

---

[47]     The record in this case suggests that the Staniches' renewals all included provision of relatively comprehensive application information, the point being that each annual renewal interaction, according to Plaintiffs, involved an exchange of information (at Travelers' instance) similar to that which would occur in an initial purchase context.

40

Moreover, it is not as though more appropriate individuals are unavailable (or likely unavailable).  Plaintiffs counsel represented at the hearing that there are class members who filled out Travelers applications *via* an "initial" purchase experience.  Tr. at 314.  At least with regard to this issue, those individuals clearly are more suited to represent the proposed Agent SubClass.[48] Accordingly, the Court concludes that the Staniches cannot satisfy the typicality and adequacy requirements of Rules 23(a)(3) and (a)(4).  The class cannot, therefore, be certified with the Staniches as its Agent SubClass representative.

### b.    Group Marketing SubClass.

Dante Frezza is the proposed representative for this subclass.  Plaintiffs allege that he purchased his insurance from Standard Fire through the group marketing program for customers of Citibank (*i.e.*, Frezza's credit card company at the time).  In sum, during one of his interactions with Citibank, he was routed (at his election) to a call center to learn about various insurance options being made available to Citibank customers – *i.e.*, *via* a sponsorship agreement between Travelers and Citibank.  After completing an application process similar (if not identical) to that in the retail channel, Mr. Frezza ultimately purchased a Travelers policy.  Travelers challenges Mr. Frezza as a class representative in two respects, neither of which is convincing.

First, it argues that his claims are not typical because he made his purchasing decision based solely on the fact that the Travelers price he received (*i.e.*, the higher price) was lower than that of his carrier at the time.  On cross-examination at the hearing, he made it clear that his motivation in

---

[48]    Of note, the Court does not conclude that the Staniches do not have claims.  While that may be true, the Court does not now reach that question.  It simply concludes that their circumstances render them sufficiently different that they are not best suited to represent the class.

switching was to get a lower price; he admitted, however, that he did not "shop around."  From this, Travelers argues that Mr. Frezza's fraud claim is subject to a unique defense – that he relied on nothing but an objective number that he found acceptable, as opposed to an even better price that was allegedly concealed.  Travelers argues, therefore, that his alleged fraud claim is not typical of that of the class because "all he cared about was whether a given price satisfied him and that it was lower than his then current price."  Tr. at 351.

Just because Mr. Frezza bought from Travelers solely because the price it offered was lower than what he had with another carrier does not mean he would not have wanted an even lower price (for an identical policy), if he knew one was available.  Travelers' own line of questioning at the hearing established that price was Mr. Frezza's primary concern.  More importantly, on direct examination, Mr. Frezza testified that: (1) he believed all of the information solicited for his Travelers application determined the price Travelers offered to him; (2) he had no reason to believe that an agent could have quoted him a better price; and (3) had Travelers told him that an even lower price for the same policy was available, he "absolutely" would have wanted it.  Tr. at 60.  Travelers has not established that Mr. Frezza is subject to a unique defense that will detract from his ability to represent the class; indeed, it is likely that many consumers acted in the same manner (and with the same motivations) as Mr. Frezza.  At best, Travelers can attempt to show that Mr. Frezza was not particularly diligent in searching for the "lowest price," but that does not make him inadequate under Rule 23.

Second, Travelers argues in their brief that, like the Staniches, Mr. Frezza renewed his policy in February 2007 after learning of the alleged fraudulent scheme in 2006 – *i.e.*, a ratification argument.  Travelers seemingly abandoned this argument at the hearing, however.  As Plaintiffs

observed, when Mr. Frezza "renewed" his policy after learning of the alleged fraud, Travelers had already stopped offering the "lower" price.  As a result, Mr. Frezza received the former-higher-priced policy because that was all that Travelers offered.  Travelers' criticism, therefore, is not one of ratification, (which would require Mr. Frezza to agree to the higher price when he knew a lower price was available); rather, Travelers' criticism centers around the fact Mr. Frezza continued to do business with a company he is suing and who he believes defrauded him.[49]  Again, while legitimate fodder for cross-examination, this is not the type of thing that renders someone atypical or inadequate under Rule 23.

Travelers also highlighted at the hearing that the Citibank program through which Mr. Frezza purchased his policy is quite different than many of the "true" affinity programs (as Travelers described them) Mr. Frezza also seeks to represent.  As noted earlier, it drew a distinction between programs offered through employers or membership organizations and programs offered through, for example, credit card companies – the distinction being that people are less likely to believe that their credit card company will look out for them in the same manner as their employer (or the like) would.  *See* Tr. at 111-13.  At most, Travelers focuses on this distinction in connection with its attack on Mr. Frezza's adequacy and typicality; Travelers does not propose, for example, that the proposed

---

[49]     While the emotional side of Travelers' argument is understandable, it is not particularly logical.  For example, assume Travelers' post-2006 rate (*i.e.*, the only one offered) was 50% lower than the rate of the nearest competitor (for substantially the same coverage).  Is Mr. Frezza required to ignore a good deal *today* from Travelers simply because he is suing them for alleged misconduct *in the past*?  Similarly, the exercise of renewing a policy is far less difficult and fraught with far less uncertainty than going through an entirely new application process.  Is Mr. Frezza required to jump through these hoops with no hope of a price benefit simply to remove himself from dealings with Travelers?  Certainly from Rule 23's perspective, the answer for these questions is "no."

Group Marketing SubClass be divided further into two subclasses reflecting the distinction that Travelers highlights.  As outlined herein, this "affinity" distinction is not fatal to Mr. Frezza's adequacy as a class representative for <u>all</u> group marketing programs.  Of course, should the Court later determine that further dividing the class is appropriate, it can do so at that time.  *See* Fed. R. Civ. P. 23(c)(5) ("When appropriate, a class may be divided into subclasses that are each treated as a class under this rule.").[50]

## IV.    NEW "AGENT SUBCLASS" REPRESENTATIVE REQUIRED.

In light of its conclusions herein, the Court determines that certification can (and should) be granted.  As to the Agent SubClass, however, certification is only appropriate *subject to* Plaintiffs' identification of a new individual to represent that subclass.[51]  As outlined *infra*, if Plaintiffs can demonstrate that a new proposed representative can satisfy Rules 23(a)(3) and (a)(4), the Court will grant Plaintiffs leave to file a second amended complaint to add the individual as the representative for the Agent SubClass.

Though this case has material differences from *Zangara*, it is essentially a second generation version of that case.  In light of the Court's findings with regard to Rules 23(a)(1)-(2) and 23(b)(3), there can be little doubt that, if the Court were simply to deny Plaintiffs' motion for class certification (either wholly or only as to the Agent SubClass), a third generation of this case likely

---

[50]    Amendments to this rule became effective December 1, 2007.  Prior to those amendments, Rule 23(c)(4)(B) provided courts with the same option.

[51]    *See Shankroff v. Advest, Inc.*, 112 F.R.D. 190, 194 (S.D.N.Y. 1986) (certifying class subject to plaintiffs proposing a new, and adequate, representative).  *See also*, *Diduck v. Kaszycki & Sons Contractors, Inc.*, 149 F.R.D. 55 (S.D.N.Y. 1993) (permitting intervention of new representatives to cure adequacy deficiencies of current representatives).

would result, the only difference being different named-plaintiffs in place of the Staniches.  In the interests of judicial efficiency and in the exercise of its broad discretion, therefore, the Court concludes that the most appropriate course is for the Court to defer a final ruling on certification (*i.e.*, including with regard to the Group Marketing SubClass) for a reasonable period of time within which Plaintiffs shall have an opportunity to cure the deficiencies outlined herein.  The procedures Plaintiffs shall follow are outlined in Section V below.[52]

## V.    **CONCLUSION**

For the foregoing reason, and in light of the findings outlined below, the Court concludes that class certification ultimately is *wholly* appropriate in this case *subject to* Plaintiffs identification of new representatives for the Agent Subclass.  The Court hereby **FINDS**:

- Plaintiffs **HAVE SATISFIED** the predominance and superiority requirements of Rule 23(b)(3);

- Plaintiffs **HAVE SATISFIED** the numerosity and commonality requirements of Rules 23(a)(1) and (a)(2);

- As to Plaintiff Dante Frezza, Plaintiffs **HAVE SATISFIED** the typicality and adequacy requirements of Rules 23(a)(3) and (a)(4); and

- As to Plaintiffs Neil and Bobbie Jean Stanich, Plaintiffs **HAVE NOT SATISFIED** the typicality and adequacy requirements of Rules 23(a)(3) and (a)(4).

For the reasons outlined in the previous section, the Court concludes that it is appropriate in this case to allow Plaintiffs leave to identify a new representative in accordance with the Court's

---

[52]    Unlike *Zangara*, this is not a circumstance in which Plaintiffs would be seeking to substitute a new plaintiff for a removed one where no other named representative of the overall class would exist.  The presence of Mr. Frezza as an adequate representative cures the standing problem that existed in *Zangara*.

directives herein.  Accordingly, it is hereby **ORDERED** that the Court **DEFERS** its final ruling on the certification of the proposed class (and subclasses) pending resolution of the following:

- From the date of this Order, Plaintiffs shall have **30 days** to identify an individual they believe can adequately represent the proposed Agent SubClass.  On or before the expiration of the 30-day deadline, Plaintiffs shall file a "NOTICE" identifying the individual to the Court and Defendants.

- The parties shall then have **45 days** from the timely filing of Plaintiffs' notice to conduct discovery (If the notice is filed early, the 45-day discovery period shall begin to run early) related to the individual's ability to satisfy Rule 23(a)(3) and (4), which are the only certification issues that will remain outstanding; and

- At any time thereafter, but by no later than **20 days** after the expiration of the 45-day discovery period, Plaintiffs shall file a motion to amend the governing complaint, the purpose for which shall be limited to (1) naming the new proposed representative, and (2) withdrawing the Staniches as proposed representatives.

Within the context of the motion to amend, the parties shall address the individual's ability to satisfy Rules 23(a)(3) and (a)(4).  As outlined herein, all other Rule 23 issues are resolved.  In ruling on the motion to amend, the Court will finalize its ruling on class certification and set a status conference to address case management issues.[53]

      **IT IS SO ORDERED.**

                                                **s/Kathleen M. O'Malley**
                                                **KATHLEEN McDONALD O'MALLEY**
**Dated: March 28, 2008**                         **UNITED STATES DISTRICT JUDGE**

---

[53]     Rule 23(g) requires the Court to appoint class counsel *at the time the class is certified*.  Given the Court's conditional ruling, the Court likewise defers appointing class counsel.  This is also appropriate in that Plaintiffs have not formally sought appointment of class counsel.  In connection with its motion to amend, but as a separate filing, Plaintiffs shall file an appropriate motion relative to appointment of class counsel under Rule 23(g).