# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| PAUL LONARDO,<br>on behalf of himself and<br>all others similarly situated,<br><br>and<br><br>DANTE FREZZA,<br>on behalf of himself and<br>all others similarly situated,<br><br>and<br><br>JOSEPH FELDMAN<br>on behalf of himself and<br>and all others similarly situated<br><br>*Plaintiffs*<br><br>VS.<br><br>THE TRAVELERS INDEMNITY<br>COMPANY<br><br>and<br><br>THE STANDARD FIRE INSURANCE<br>COMPANY<br><br>*Defendants* | CASE NO. 06 CV962<br><br>JUDGE KATHLEEN M. O'MALLEY |

## SETTLEMENT CLASS COUNSELS' PETITION FOR AWARD OF ATTORNEY'S FEES AND EXPENSES

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ...................................................................................................1

II.     FACTUAL BACKGROUND ................................................................................ 1

      A.      The Litigation ...........................................................................................1

      B.      Settlement Negotiations ............................................................................7

      C.      The Settlement ..........................................................................................8

III.    AWARD OF ATTORNEYS FEES .....................................................................11

      A.      The Lodestar Approach Is The Most Appropriate Method To Determine the
            Reasonableness Of The Attorneys' Fees. ...............................................11

      B.      A Multiplier Is Appropriate To Enhance The Lodestar Amount...........................14

            1.      The Value Of The Benefits Rendered To The Class Supports The
                  Requested Multiplier............................................................................15
            2.      The Value To Society Supports The Requested Multiplier.....................15
            3.      The Fact That Class Counsel Undertook The Litigation On A Contingent
                  Fee Basis Supports The Requested Multiplier...........................................19
             4.      The Value Of The Services On An Hourly Basis Supports
                  The Requested Multiplier .......................................................................20
             5.      The Complexity Of The Litigation Supports The Requested Multiplier...20
             6.      The Professional Skill And Standing Of Class Counsel Supports
                  The Requested Multiplier .......................................................................21
             7.      Injunctive Relief For Three (3) Years.......................................................22

      C.      The Percentage Of The Fund Methodology As A Check Does Not Render The
            Requested Fee Unreasonable ...................................................................23

            1.      Claims Actually Paid ..............................................................................24
            2.      Reversion From The Attorney Fee Fund ...................................................29
            3.      Costs Of Notice And Administration.........................................................30
            4.      Attorney Fees And Expenses Paid By Defendant.....................................30

  IV.    CONCLUSION.....................................................................................................32

i

## TABLE OF AUTHORITIES

## CASES

*Arenson v. Board of Trade of City of Chicago*, 372 F. Sup. 1349 (D.C. Ill. 1974) ....................16

*Bailey v. AK Steel Corp.,* 2008 WL 553764 (S.D. Ohio 2008) .................................................22

*Behrens v. Wometco Enterprises, Inc.*, 118 F.R.D. 534 (S.D. Fla. 1998)...................................22

*Bebchick v. Washington Metropolitan Area Transit Commission*,
805 F.2d 396 (D.C. Cir. 1986) .................................................................................................. 16

*Boeing Co. v. Van Gemert*, 444 U.S. 472 (1980)............................................................24, 27, 29

*Bowling v. Pfizer, Inc.,* 102 F.3d 777, 779 (6th Cir. 1996).................................................. 12, 14

*Bowling v. Pfizer, Inc.,* 922 F. Supp. 1261 (S.D. Ohio 1996)..................................................... 12

*Central States Southeast and Southwest Areas Health and Welfare Fund v. Merck-Medco
Managed Care*, 433 F.3d 181 (2d Cir. 2005) ............................................................................ 15

*Cherner v. Transitron Electric Corp.* 221 F. Supp. 55 (D. Mass. 1963) .................................... 19

*City of Riverside v. Rivera*, 477 U.S. 561 (1986) ......................................................................16

*Deloach v. Philip Morris Companies* 2003 WL 23094907 (M.D.N.C., 2003) .........................13

*Environmental Defense Fund Inc. v. Environmental Protection Agency*, 672 F.2d 42,
(D.C. Cir. 1982) ........................................................................................................................16

*Enterprise Energy Corp. v. Columbia Gas Transmission Corp.,* 137 F.R.D. 240
(S.D. Ohio 1991).......................................................................................................................22

*Fournier v. PFS Investments, Inc.*, 997 F.Supp. 828 (E.D. Mich. 1998).......................14, 16, 23

*Kathryn Harlow Holznagel v. Charter One Bank, F.S.B.*, CV-98-362560 (Cuyahoga County,
June 25, 2003) ...........................................................................................................................32

*In re Advanced Lighting Technologies, Inc. Sec. Litig.,* No. 1:99CV836 (N.D. Ohio E. D.
Jan. 17, 2003).............................................................................................................................31

*In re Cincinnati Gas & Elec. Co. Sec. Litig.*, 643 F.Supp. 148 (S.D. Ohio 1986) ....................31

*In re Cincinnati Microwave, Inc. Sec. Litig.,* No. C-1-95-905 (S.D. Ohio Mar. 21, 1997)........31

*In re Diet Drugs*, 582 F.3d 524 (3rd Cir. 2009)........................................................................15

*In re Fernald Litig.* unreported at 1989 WL 267038 (S.D. Ohio Sept. 29, 1989) ..................... 19

*In re Future Healthcare Sec. Litig.,* No. C-1-95-180 (S.D. Ohio Dec. 5, 2000) ....................... 31

*In re General Motors Corp. Pick-Up Truck Fuel Tank Products Liability Litig.,*
55 F.3d 768, 821 (3d Cir. 1995)................................................................................. 12, 31

*In re Gibson Greetings Sec. Litig.,* No. C-1-95-265 (S.D. Ohio Feb. 7 1997) .......................... 31

*In re Gliatech, Inc. Sec. Litig.,* No. 1:100CV2236 (N.E. Ohio, E.D. May 13, 2003)................ 31

*In re Insurance Brokerage Anti-Trust Litig.,* 579 F.3d 41 (3rd Cir. 2009)................................. 14

*In re Nord Res. Sec. Litig.,* NO. C-3-90-380 (S.D. Ohio Apr. 28, 1994) ................................. 31

*In re Revco Sec. Litig.,* unreported at 1992 WL 118800 (N.D. Ohio 1992) ............................. 22

*In re Sulzer Hip Prosthesis And Knee Prosthesis Liab. Litig.* 268 F. Supp.2d 907 (N.D. Ohio
2003) ...................................................................................................... 12, 14, 15, 23

*In re Structural Dynamics Research Corp. Sec. Litig.,* No. C-1-94-630
S.D. Ohio Mar. 22, 1996) ................................................................................................. 31

*In re Telectronics Pacing Systems, Inc.,* 137 F.Supp. 2d 1029 (S.D. Ohio 2001)..................... 12

*In re Trustcorp. Sec. Litig.,* No. 3:89-CV-7139 (N.E. Ohio W.D. Aug. 30, 1990) ................... 31

*In re Valley Sys. Sec. Litig.,* No. 5:92cv2124 (N.D. Ohio E.D. Mar. 16, 1994) ....................... 31

*In re Vitamins Antitrust Litig.,* 2001 WL 34312839 (D.D.C.) ................................................. 30

*In re Wash. Pub. Power Supply Sys. Sec. Litig.,* 19 F.3d 1291 (9th Cir. 1994).......................... 14

*International Precious Metals Corp. v. Waters,* cert. denial, 530 U.S. 1223 (2000). ................ 29

*Johnston v. Comerica Mortgage Corporation,* 83 F.3d 241 (8th Cir. 1996)................... 12, 13, 30

*Jordan v. City of Cleveland,* 464 F.3d 584 (6th Cir. 2006) ....................................................... 15

*Lobatz v. U.S. West Cellular of California., Inc.,* 222 F.3d 1142 (9th Cir. 2000) ....................... 13

*Mangone v. First USA Bank,* 206 F.R.D. 222 (S.D. Ill. 2001). ................................................ 30

*Masters v. Wilhelmina Model Agency, Inc.,* 473 F.3d 423 (2nd Cir. 2007)................................ 26

*McKinnie v. JP Morgan Chase Bank, N.A.* 2009 WL 5217673 (E.D.Wis. 2009)..................... 27

*Ramey v. Cinn. Inquirer, Inc.,* 508 F.2d 1188 (6th Cir. 1974)............................................. 16, 31

iii

*Rawlings v. Prudential-Bache Properties, Inc.*, 9 F.3d 513 (6th Cir.1993) .............12, 13, 14, 16

*Rodriguez v. West Publishing Corp.*, 563 F.3d 948 (9th Cir. 2009).....................................12, 14

*Santos v. Administrator – Ohio Bureau of Workers' Compensation,* CV-99-393694 (Cuyahoga County, April 13, 2005)...............................................................................................................32

*Vijay Sherma v. Cole National Corp.*, No. 1:02CV2397 (N.D. Ohio E.D. Div. September 29, 2003) .................................................................................................................................................31

*S/O ex rel White v. Cuyahoga Metropolitan Housing Auth.*, 1998 WL 934857 (Ohio App. 8th Dist. Dec. 29, 1988) .......................................................................................................................32

*Staton v. Boeing Co.,* 327 F.3d 938, 975 (9th Cir. 2003).   ............................................14, 22, 30

*Strong v. BellSouth Telecommunications, Inc.*, 137 F.3d 844 (5th Cir. 1998);  .............26, 28, 29

*Vizcaino v. Microsoft Corp.*, 290 F.3d 1043 (9th Cir. 2002)..................................................14, 23

*Weinberger v. Great Northern Nekoosa Corp.*, 925 F.2d 518 (1st Cir. 1991) ...........................13

*Waters v. Int'l Precious Metals Corp.*, 190 F.3d 1291 (11th Cir.1999) 1223 (2000). .....27, 28, 29

*Williams v. MGM-Pathe Commun. Co.*, 129 F.3d 1026 (9th Cir.1997).........................27, 28, 29

*Wing v. Asarco, Inc.*, 114 F.3d 986 (9th Cir. 1997)...............................................................13, 15

*Wise v. Popoff*,  835 F.Supp. 977, 982 (E.D.Mich.,1993).   .....................................................26

## RULES

Advisory Committee Notes F. R.C.P. Rule 23(h)..........................................................................25

## STATUTES

15 U.S.C. §1712 .............................................................................................................................25

28 U.S.C. §77-78.............................................................................................................................25

R.C. §3937.02(D) ...........................................................................................................................17

R.C. §3937.04(D) ...........................................................................................................................20

## TREATISES

Alba Conte & Herbert B. Newberg, *Newberg on Class Actions* (4th ed.2002 & 2009) ........................................................................................23, 27, 28

Federal Judicial Center *Manual for Complex Litigation (Fourth)* (2004)....................................25

## I.        INTRODUCTION

Class counsel seek an award of attorneys fees in the amount of $4.6 million.  In assessing the reasonableness of the request, the Court should employ the "lodestar" analysis with the "percentage of the fund" analysis utilized as a check.  Application of this approach and consideration of the societal value of the termination of a discriminatory practice support a finding of reasonableness.  Through the efforts of Plaintiffs and their counsel, a Settlement in this matter was reached which includes benefits for the class members as follows:

- The termination of the subject discriminatory practice.  Injunctive relief requiring that the practice not be reinstated for at least three years from the Effective Date[1].  Settlement Agreement, §II.G.
- A claims-made cash distribution program that provides for refunds of $8.69 per policy period to all class members potentially totaling approximately $17,943,693.18 in cash relief.    (Declaration of Robert Oseas Regarding Notice and Class Settlement Administration, hereinafter referred to as "Oseas Declaration", See D.C. Docket No. 174).
- Payment by settling Defendants' of the costs associated with a direct mail notice program, publication notice and claims administration totaling approximately $420,306.00.  (Oseas Declaration);
- Payment by Defendants of counsel's fees and expenses (up to $6.6 Million) in a manner that does not diminish amounts owed or paid to the Settlement Class members.  Settlement Agreement, §II.F.2.
- A reversion of $2 Million to Class members from the unawarded portion of the attorney fee fund.

## II.       FACTUAL BACKGROUND

### A.        <u>The Litigation</u>

---

[1] "Effective Date" is defined as:
     "the later of (1) the date on which the time to appeal the Final Judgment has expired with
     no appeal having been taken or motion for reargument or review having been filed."
Settlement Agreement, §II.D.2, p. 14.  Settlement Agreement and Exhibits to Settlement Agreement found at D.C.
Docket No. 168.

On March 14, 2005, the undersigned counsel filed the case of *Vincent Zangara, et al. v. Travelers Indemnity Company of America*[2], *et al.*  (*See generally Zangara v. Travelers Indemnity Company*, United States District Court, Northern District of Ohio, D.C. Docket No. 1:05-cv-731.  Hereinafter referred to as "*Zangara.*"  The Complaint alleged that on March 19, 2002 the Travelers Indemnity Company of America sold the Plaintiffs a "homeowners insurance policy without disclosing to them the availability of a less expensive Travelers homeowners policy offering identical coverage and policyholder service."  *Zangara,* D.C. Docket No. 2, ¶12.  It further alleged that Travelers Property Casualty Insurance Company[3] owned Travelers Indemnity Company of America.  *Zangara,* D.C. Docket No. 2, ¶4.  On June 6, 2005, the *Zangara* briefing began with the defendants filing a Motion to Dismiss (*Zangara*, D.C. Docket Nos. 10 & 11)  and a Motion to Strike Class Allegations.  (*Zangara*, D.C. Docket Nos. 12 & 13).  On July 13, 2005, the Plaintiffs filed a Response to the Motion to Dismiss (*Zangara* D.C. Docket Nos.  19 & 20).  Further, on July 18, 2005, the Plaintiffs filed an Opposition to the Motion to Strike Class Allegations (*Zangara*, D.C. Docket No. 22) and a Motion for Class Certification.  (*Zangara*, D.C. Docket No. 23).  A flurry of other briefing also ensued.  Discovery began despite Defendants' Motion to Stay Discovery (*Zangara*, D.C. Docket No. 18).  On January 18, 2006, plaintiff Vincent Zangara was deposed and on February 16, 2006 Travelers produced documents.  On March 6, 2006, the undersigned counsel moved for leave of court to file a Second Amended Class Action Complaint.  (*Zangara*, D.C. Docket No. 56).  This motion, coupled with the Court's

---

[2] The Travelers Indemnity Company of America is a different company than Defendant in this matter The Travelers Indemnity Company.  However, ultimately both companies are "Settling Insurers."  Settlement Agreement, §I.A.10, p. 4.  *See also* **List Of Settling Insurers** found at Exhibit "A" to Settlement Agreement previously filed at D.C. Docket No. 168-2.  The Exhibit A incorporation into and as part of the Settlement Agreement is found at §I.A.10, p. 4 of the Settlement Agreement.

[3] Again, Travelers Property Casualty Insurance Company is not a named Defendant in this matter but is a Settling Insurer.  Settlement Agreement, §I.A.10, p. 4.

denial of the motion to dismiss on March 16, 2006 (*Zangara*, D.C. Docket No. 57) set-off a legal

struggle that would continue unabated until the Settlement of this matter was reached.

The two vastly differing viewpoints of the *Zangara* litigation led to such acrimonious

litigation that it is truly amazing any settlement in this matter could be reached.[4]  On March 6,

2006, counsel for Plaintiffs requested a leave to file an Amended Complaint to add two new

plaintiffs and one new defendant.  (*Zangara*, Docket No. 56-1).  In the pleading, counsel for Mr.

Zangara indicated the following:  "On February 16, 2006 Travelers produced documents that

indicated that the proper Defendants in this matter are Travelers Property Casualty Insurance

Company and The Standard Fire Insurance Company and that the Travelers Indemnity Company

of America is not a proper Defendant.  Further, due to the fact that Mr. Zangara was insured by

Travelers Indemnity Company of America, he does not have a claim against it or Travelers

Property Casualty Insurance Company."  (*Zangara*, Docket No. 56-1, p. 1).   In other words,

counsel for Plaintiff indicated that it believed that Mr. Zangara had purchased the low priced

Travelers policy .[5]   On March 16, 2006, while the motion to substitute and amend the Complaint

was pending, the Court denied the motion to dismiss.  (*Zangara*, Docket No. 57).  Travelers

opposed the motion to amend and filed a motion to dismiss the case for lack of subject matter

---

[4] Travelers' position is succinctly summarized in the Notice which reads:  "Defendants deny Plaintiffs' allegations and have asserted numerous defenses to Plaintiffs' claims.  Defendants do not admit liability to any Class member and do not admit liability for any of Plaintiffs' allegations.  Further, Defendants deny any wrongful conduct toward Plaintiffs or the Class, and assert that the alleged wrongful actions were lawful in all respects and in fact benefited insureds, consumers, and Independent Agents."  Notice, D.C. Docket No. 168-6.  As the Court will recall, during the two day class certification hearing, one of the witnesses that Travelers called was Lee Covington, the former Director of the Ohio Department of Insurance.  (Covington Testimony, May 14, 2007, pp. 215-217).  Covington opined that this practice was known and approved of by the Ohio Department of Insurance.  (Covington, pp. 222-225).

[5] The multiple reasons that counsel believed that Mr. Zangara had purchased the lowest priced policy are outlined in Plaintiff's Motion For Relief From Judgment And Memorandum In Support Of Motion (Filed Under Seal). *Zangara*, Docket No. 72.

jurisdiction and a motion to vacate all prior orders which was granted on March 30, 2006. (*Zangara*, Docket Nos. 58, 60, 6, 62).   Thereafter, Travelers filed a Motion For Sanctions Pursuant to Fed. R. Civ. P. 11 and 28 U.S.C. 1927.   (*Zangara,* Docket No. 64).  After extensive briefing, the Court denied the motion.  ( *Zangara* Docket Nos.  67, 69, 70).

While the skirmish regarding the sanctions issue was being litigated, Plaintiffs filed the instant case of *Neil Stanich and Bobbie Jean Stanich and Dante Frezza, on behalf of themselves and all others similarly situated vs. Travelers Property Casualty Insurance Company and The Standard Fire Insurance Company* on April 19, 2006.  (D.C. Docket No. 1).   Despite this Court's denial of the motion to dismiss in *Zangara*, the Defendants again moved to dismiss this action.  (D.C. Docket No. 14).   The Court held a case management conference and discovery began soon thereafter.  (D.C. Docket No. 13).   By September 2006, the parties were engaged in continuous and unabated discovery disputes.  The discovery disputes were so intractable and frequent that after discovery dispute conferences on January 16, 2007 and January 19, 2007, this Court indicated that Judge Hemann would help handle some of the discovery issues.  Due to the complexity and number of issues, Judge Hemann held formal hearings to resolve discovery disputes on January 31, 2007; February 22, 2007; March 8, 2007; and April 4, 2007.  (D.C. Docket Nos. 40, 42, 48, 49, 57, 61, 74).  Four, in-person, formal hearings to decide discovery disputes, over a period of approximately 8 weeks, in addition to the multiple conferences and letters, demonstrate that this was hard fought contested litigation.   As this Court is well aware, the litigation was so contentious that on April 10, 2007 this Court held a hearing with a court reporter present as to whether to allow Plaintiffs' to amend their Complaint.  (D.C. Docket No. 75).

On April 20, 2007, after extensive discovery, Plaintiffs filed their Motion For Class Certification and all of the papers and evidence in support of same.  (See D.C. Docket Nos. 107 & 109 for Motion and supporting Brief and D.C. Docket No. 110 for Appendix to Memorandum In Support of Motion For Class Certification;  D.C. Docket Nos. 81 & 100 Deposition Transcript and Videodisks of Robert C. Asher; D.C. Docket Nos. 82 & 101 Deposition and Videodisks of Richard Cuozza; D.C. Docket Nos. 83 & 102 Deposition and Videodisks of Mark Mastrianni; D.C. Docket Nos. 84 & 104 Deposition and Videodisks of Lucille Mulroy; D.C. Docket Nos. 85 & 105 Deposition and Videodisks of Randall Pillen; D.C. Docket Nos. 86 & 106 Deposition and Videodisks of Pamela Roy; D.C. Docket Nos. 87 & 103 Deposition and Videodisks of Michael McNally; D.C. Docket Nos. 88 & 97 Depositions and Videodisks of James Roddenberry; D.C. Docket Nos. 89 & 98 Deposition and Videodisks of John Swartz; D.C. Docket Nos. 90 & 99 Deposition and Videodisks of Nancy Tehan; D.C. Docket Nos. 91 & 96 Deposition and Videodisks of Michael Cristal; D.C. Docket Nos. 92 & 94 Deposition and Videodisks of Thomas Chatham; D.C. Docket Noss. 93 & 95 Deposition and Videodisks of Lee Covington, II. )  On May 4, 2007 the Defendants filed their opposition to the class certification papers (D.C. Docket No. 118 & 119)  as well as deposition transcripts and other evidence that they wanted before the Court.  (D.C. Docket Nos.  113, 114, 115, 116, 118 and 120).

On May 14 and 15, 2007, the Court conducted a two day class certification hearing during which eight live witnesses were called by the parties to testify.  (*See* Transcript of hearing D.C. Docket Nos. 124 & 125.  *See also* Order Regarding Class Certification, pp. 1-2, FN. 4. D.C. Docket No. 128).  After the Court took the matter under advisement, the Defendants filed a Notice of Additional Authority in Opposition to Plaintiffs' Motion For Class Certification on

May 25, 2007 (D.C. Docket No. 122), and on June 13, 2007, after leave being granted, (D.C.

Docket No. 123) Plaintiffs filed a sur-reply to the additional authority. (D.C. Docket No. 126).

On March 28, 2008, this Court entered its 46-page Order Regarding Class Certification.

(D.C. Docket No. 128). The Order made certain findings but deferred the final ruling on class

certification because the Court ruled that Plaintiffs Neil and Bobbie Jean Stanich, the proposed

Agent SubClass representatives, failed to meet the typicality and adequacy requirements of Rule

23(a)(3) and (a)(4). Therefore, Plaintiffs were given time to identify a new Agent SubClass

representative and for the parties to conduct discovery to determine the "individual's ability to

satisfy Rules 23(a)(3) and (a)(4)" (D.C. Docket No. 128, p. 46). Plaintiffs identified Paul

Lonardo the new Agent SubClass representative and discovery regarding Mr. Lonardo's ability

was undertaken. (D.C. Docket No. 129). On July 24, 2008 the Plaintiffs moved to substitute in

Mr. Lonardo as the Agent SubClass representative (D.C. Docket No. 132) and thus began a

whole new round of extensive briefing[6]. On January 26, 2009, this Court entered a fifty (50)

page Memorandum & Order granting the motion to substitute and appointing class counsel, and

fully resolving Plaintiffs' Motion for Class Certification. (D.C. Docket No. 141). Said Order

---

[6] Notice of Filing Deposition Transcript (Paul Lonardo) (D.C. Docket No. 131); Defendants' Motion to Compel and For A Finding of Inadequacy And For the Appointment of New Putative Class Counsel Under Rule 23(G) of the Federal Rules of Civil Procedure (D.C. Docket No. 133); Defendants' Response in Opposition to Plaintiffs' Motion to Amend to Substitute Paul Lonardo as Agent Subclass Representative in Place of Neil Stanich and Bobbie Jean Stanich (D.C. Docket No. 134); Motion to Exceed Page Limitations for Plaintiffs' Reply to Defendants' Response in Opposition to Plaintiffs' Motion to Amend to Substitute Paul Lonardo as Agent Subclass Representative in Place of Neil Stanich and Bobbie Jean Stanich (D.C. Docket No. 136); Plaintiffs' Reply to Defendants' Response in Opposition to Plaintiffs' Motion to Amend to Substitute Paul Lonardo as Agent Subclass Representative in Place of Neil Stanich and Bobbie Jean Stanich (D.C. Docket No. 137); Notice of Filing Deposition Transcript (Judy Lonardo) (D.C. Docket No. 138); Plaintiffs' Response to Defendants' Motion to Compel and For A Finding of Inadequacy And For the Appointment of New Putative Class Counsel Under Rule 23(G) of the Federal Rules of Civil Procedure and Motion for Appointment Pursuant to Rule 23(G) (D.C. Docket No. 139); Defendants' Reply in Support of their Motion to Compel and For A Finding of Inadequacy And For the Appointment of New Putative Class Counsel Under Rule 23(G) of the Federal Rules of Civil Procedure (D.C. Docket No. 140).

was appealed to the Sixth Circuit Court of Appeals pursuant to Fed. R. Civ. R. 23(f) and after briefing was affirmed on April 24, 2009.  (*See* In re The Standard Fire Insurance Company; The Travelers Indemnity Company, Petitioners.   United Stated Court of Appeals for the Sixth Circuit, Case No. 09-0301).

After granting class certification, this Court held a pre-trial conference whereby it established dates for merits discovery and experts and for the submission of Plaintiffs' form of notice and plan of notice   (D.C. Docket No. 144) which Plaintiffs submitted on April 1, 2009. (D.C. Docket No. 146).   Thereafter, the Court held another conference on April 9, 2009, wherein the Court questioned whether the parties had any desire in attempting to mediate the dispute.  (D.C. Docket No. 147).

The notice contemplated by the Plaintiffs generated disputes as to the terminology of the notice, the exact parameters of the class action certified, and further discovery sought. Therefore, on June 9, 2009 the Court held a Status Conference and entered rulings to establish parameters to resolve these issues (i.e. form of notice; discovery related to the potential class list; renewal purchases as members of the class; discovery related to the "Quantum" program; interrogatory numbers allowed to be served; social security numbers; expert report deadlines; and punitive damages discovery).  (D.C. Docket No. 155).  On July 9, 2009 the Court held another status hearing to discuss issues related to discovery of a potential renewal class.  (D.C. Docket No. 158).   While working through the issues addressed in the June 9, 2009 and July 9, 2009 status conferences, the parties began settlement negotiations.

**B.**     **Settlement Negotiations**

7

Although the April 9, 2009 overture from the Court inquiring whether or not the parties wished to mediate the dispute did not result in mediation, it did result in the parties discussing a potential resolution.  Settlement negotiations were protracted, difficult, and certainly at arm's length.  After several preliminary telephone discussions between counsel, the two sides finally met in Memphis, Tennessee, for an all-day settlement negotiation on June 11, 2009.  (Affidavit of R. Eric Kennedy  in Support of Motion for Final Approval of Class Action Settlement and Settlement Class Counsels' Petition for Award of Attorneys' Fee, Expenses and Incentive Award to Class Representatives, hereinafter referred to as Kennedy-1 Affidavit. See D.C. Docket No. 175, attached as Exhibit D.)  Additionally, prior to meeting in Memphis the parties engaged in extensive informal information exchange.  After Memphis the parties remained far apart and further information was exchanged between the parties.  *Id.*  Discussions continued and the parties met again in Chicago on July 24, 2009.  *Id.*  Between July and September, further information was exchanged and additional discussions took place.  On September 16 and 17, 2009, the parties again met face to face and finally reached a settlement.  *Id.*

Throughout the negotiations, counsel was aware of the authority indicating that Class Counsel's fees might be determined, in part, in relation to claims actually paid.

### C.    <u>The Settlement</u>

The Settlement Agreement was the result of hard fought litigation and arm's length negotiations.  The key terms of the Settlement Agreement are as follows:

<u>Settlement Class Definition:</u>

5.  "Class" or "Settlement Class" means, for settlement purposes only and for no other purpose:  All persons in the United States who made an initial purchase of a homeowners insurance Class Policy (as that term is defined

elsewhere) from a Settling Defendant for a property located in the states of Alabama, Arkansas, Colorado, Illinois, Kentucky, Louisiana, Mississippi, Missouri, North Carolina, Ohio, South Carolina, and Tennessee, who were eligible to purchase Travelers homeowners insurance offering identical coverage and service, at lower price, during the relevant "Class Period" for each respective state as set forth below. The precise "Class Policies" include only the policies described for the relevant time periods listed for each state in Exhibit B.[7] The Class Period for each state is defined as follows: Alabama – July 25, 1998 to September 20, 2003; Arkansas – September 18, 1999 to March 17, 2003; Colorado – August 22, 1997 to September 20, 2003; Illinois – August 22, 1997 to December 20, 2003; Kentucky – August 22, 1997 to May 17, 2003; Louisiana – August 22, 1997 to September 20, 2003; Mississippi – May 15, 1999 to September 20, 2003; Missouri – August 22, 1997 to May 17, 2003; North Carolina – August 22, 1997 to March 16, 2003; Ohio – March 7, 1998 to May 18, 2003; South Carolina – August 22, 1997 to December 17, 2005; and Tennessee – March 7, 1998 to May 17, 2003. Excluded from the Class is any Class member who timely elects to be excluded from the Settlement Class, and all present and former agents of Defendants during the Class Period; all present and former employees of Defendants during the Class Period; and all members of the judiciary of the Court, and members of their immediate family. Settlement Agreement, §I.A.5, pp 2-3.

Cash Payments To Class Members:

      1.     The Defendants agree to pay $8.69 to each Class member for each completed Class Policy Period, for any Class Policy described in the Class definition in paragraph I.A.5, in response to valid claims submitted in conformity with the claims procedure. Defendants will pay a pro-rata portion of this amount, calculated by the number of days-in-force, for each period in which a Class Policy was in force for less than a full 12-month term. Class members with a policy in force at the time of the execution of this Settlement Agreement will receive the full $8.69 for the current 12-month policy period. Defendants shall make these payments in response to properly completed Claim Forms submitted by Class members to the Notice and Claims Administrator within 30 days after the Effective Date, as set forth in Section II.D.2, above. No interest shall accrue or be due on payments to Class Members. Settlement Agreement, §II.E.1, p. 15.

Equitable Relief:

      1.  Subject to the two conditions set forth below, Defendants agree not to change their current practice of (a) providing a single premium price point for homeowners insurance for any given Risk Group when purchasing from an

---

[7] "Class Policy" also includes the renewals of the policies listed in Exhibit B where at the time of the renewal date the price paid was not the lowest available price from another Settling Defendant or affiliated company.

Independent Agent, and (b) refraining from providing a premium price point for homeowners insurance for any given Risk Group that is lower when purchasing from an Independent Agent than when purchasing from a group marketing program.

Conditions:

(a)    This agreement shall only apply for a period of three years from the Effective Date, and only for the Class states; and

(b)    This agreement does not prohibit the Defendants from changing their current practices if disclosures are made to any affected Risk Group, or if there are material changes in applicable statutes, rules, regulations, case law or regulatory authorities. Settlement Agreement, §II.G, p 17.

Notice Plan:

D.    Notice Plan.

1.    In the event that the Court preliminarily approves the Settlement Agreement and the Notice plan, within 21 days[8] or such other period of time to which the Parties agree to writing and the Court approves, the mailing of the Court approved Notice shall be made to the potential Class Members.  No materials other than Court approved materials shall be included in the mailing. The Notice shall refer all potential Class members to a toll-free telephone line, a website, and to a written clearinghouse address, which shall be maintained by the Notice and Claims Administrator.  The mailed Notice will include a separate Claim Form.

2.    The mailed Notice shall include the Claim Form, Exhibit F, attached.  The Claims Form requires: (1) the Class members to acknowledge that by signing and returning the Claim Form, the Class members are agreeing with the statement that "If I had been told of the availability of a lower-priced policy available from the Settling Defendants or their affiliates that offered the same coverage and same service, I would have purchased that lower-priced policy"; and (2) also requires the Class member's signature, name, address, and telephone number, which is the basic information necessary to initially verify the Class member's identity and entitlement to a Settlement Payment.

---

[8] Unless otherwise provided by the use of the phrase "business days" all time periods in this Agreement are in calendar days, and include Saturdays, Sundays, and legal holidays.  If the deadline falls on a Saturday, Sunday or legal holiday (as defined in the Federal Rules of Civil Procedure), then the act to be done will not be due until the next day that is not a Saturday, Sunday or legal holiday.

3.    The outside of the mailed Notice envelope shall identify the correspondence as pursuant to Court Order.  The outside of the Notice envelope shall also state that mail is to be automatically forwarded to any newer address.

4.    Defendants will also cause a one-time notice of this Settlement to be published in the USA Today, or similar publication with nationwide distribution.  A copy of the Publication Notice Form is attached hereto as Exhibit G.

5.    Defendants' best estimate is that there are approximately 2,239,136 Class Policy Periods, and many such Class Policy Periods would represent multiple annual renewals of policies held by Class members.  For purposes of providing mailed Notice, the Defendants shall provide the Notice and Claims Administrator the current or last known addresses for the potential Class Members, all of whose policies were in force at any time between August 22, 1997 and the date of the Settlement Agreement.  Prior to mailing notice, the Notice and Claims Administrator shall run all addresses through the National Change of Address Database.  Compliance with this provision of the Settlement Agreement shall be attested to under penalties of perjury by Defendants, or by the Notice and Claims Administrator.  Settlement Agreement, §II.B, pp 9-10.

Settling Defendants Paid For Notice And Claims Administration:

1.    Defendants will pay all costs of implementing  the Notice Plan, including the expenses of the Administrator in connection with the Claims Program.  Such payments shall not deplete the amounts otherwise available to the Class or owed under this Agreement.  Settlement Agreement, §II.F.1, p. 16.

Attorneys Fees And Expenses **:**  Defendants agreed to pay attorneys' fees and expenses in an amount not to exceed $6,600,000 without depleting the settlement payments to be made to Settlement Class members.   Settlement  Agreement,  §II.F.2,  pp. 16-17. Subsequent to the Settlement Agreement, Defendants agreed to pay up to $2 Million in unawarded fees to the Class.  Because Class Counsel requested $4.6 Million, this payment to the Class is virtually guaranteed.  The Settlement Agreement will be amended to reflect this additional class benefit.

## III.    AWARD OF ATTORNEYS FEES

### A.    **The Lodestar Approach Is The Most Appropriate Method To Determine the Reasonableness Of The Attorneys' Fees**

In light of the unique characteristics of class actions in general and of the unique

circumstances of each case, courts have been afforded broad discretion in their determination of

fee awards. *Bowling v. Pfizer, Inc.*, 102 F.3d 777, 779 (6th Cir.1996); *Rawlings v. Prudential-Bache Properties, Inc.*, 9 F.3d 513, 516 (6th Cir.1993); *Rodriguez v. West Publishing Corp.*, 563 F.3d 948 (9th Cir. 2009). Courts employ two primary methods in analyzing a request for attorney fees: "lodestar" and "percentage of the fund." *In re Sulzer Hip Prosthesis And Knee Prosthesis Liab. Litig.* 268 F. Supp.2d 907, 922 (N.D. Ohio 2003), *citing Rawlings*, 9 F.3d at 515-16; *see also Johnston v.Comerica Mortgage Corp.*83 F.3d 241, 244-45 (8th Cir. 1996). Under the lodestar methodology, the hours expended by an attorney are multiplied by a reasonable hourly rate of compensation so as to produce a fee amount which can be adjusted, up or down, to reflect the individualized characteristics of a given action. *Sulzer*, 268 F. Supp.2d at 922, *citing Penn. v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 565 (1986); and *In re Telectronics Pacing Systems, Inc.*, 137 F.Supp.2d 1029, 1041 (S.D.Ohio 2001). In contrast, under the percentage of the fund methodology, the court awards a fee that is equal to some fraction of the common fund that the attorneys were successful in garnering during the course of the litigation. *Id.* Both approaches have distinct attributes that make them more suitable for particular types of cases. *Sulzer*, 268 F. Supp.2d at 922; *Johnston* 83 F.3d at 245, *citing*, *Court Awarded Attorney Fees,* Report of the Third Circuit Task Force (Arthur R. Miller, Reporter), 108 F.R.D. 237, 250-53 (October 8, 1985); *see also In re General Motors Corp. Pick-Up Truck Fuel Tank Products Liability Litig.*, 55 F.3d 768, 821 (3d Cir. 1995).

Percentage of the fund has been the preferred method in common fund cases, where a single fund of money is created and each class member is assessed his share of the fee. *See Bowling v. Pfizer*, 922 F.Supp. 1261, 1278-79 (S.D.Ohio 1996), aff'd, 102 F.3d 777 (6th Cir.1996); it can more easily be calculated and more accurately reflects the results achieved. *Rawlings v. Prudential-Bache Properties, Inc.*, 9 F.3d at 516

Lodestar has been favored (although not uniformly applied) in statutory fee shifting cases and in cases, such as the present one, in which fee awards are to be paid independently, rather than out of a settlement fund.  In *Wing v. Asarco, Inc.*, 114 F.3d 986, (9th Cir. 1997), parties to a class action settlement separately agreed that Defendants would pay attorney fees, as determined by the Court.  There, the Ninth Circuit determined that it was appropriate for the district court to have employed the lodestar method and, since the fees were to be paid by agreement (as opposed to statute), to have applied a lodestar enhancement.

Similarly, in *Deloach v. Philip Morris Companies* 2003 WL 23094907 (M.D.N.C. 2003), (See attached Exhibit X), the court similarly found the lodestar multiplier approach to be most appropriate in a situation where the parties had agreed that Defendants would pay reasonable attorney fees (as determined by the court) independent of their obligation to pay class member damages in excess of one billion dollars.  *Id.* at 4.

*Johnston v. Comerica Mortgage Corp.*, 83 F.3d at 245-246 involved settlement of a class action brought by residential mortgagors against mortgagees.  Pursuant to agreement of the parties, attorney fees, as determined by the court, were to be paid by Defendants in addition to and independent of the benefits created for the class.  The 8th Circuit upheld the district court's application of the lodestar approach.

In *Weinberger v. Great Northern Nekoosa Corp.*, 925 F.2d 518, 524-527 (1st Cir. 1991), the court noted that where fees were to be awarded from a separate fund and the defendant agreed, with limitation, not to contest that amount, the lodestar approach afforded greater scrutiny.  *See also Lobatz v. U.S. West Cellular of California., Inc.,* 222 F.3d 1142 (9th Cir. 2000) (lodestar applied in case where fees were not to be paid from the class settlement).

After deciding which method to employ, the alternative method can be applied secondarily to cross check the reasonableness of the fee. *In re Sulzer* 268 F. Supp.2d at 922, *citing Bowling v. Pfizer, Inc.*, 102 F.3d at 779; *Fournier v. PFS Investments, Inc.*, 997 F.Supp. 828, 831 (E.D.Mich.1998); *See also Vizcaino v. Microsoft Corp.,* 290 F.3d 1043, 1047, 1050 (9th Cir. 2002).

Like in those cases described, this case involves a fee award to be paid independently (and in addition to) the value of benefits bestowed upon the class.  As such, it would be most appropriate to apply the lodestar analysis with a percentage of the fund cross check.

Class counsel's total lodestar is $3,489,875.00.  (See attached Exhibits A thru G, Affidavits of Counsel with supporting documentation.)

**B.    <u>A Multiplier Is Appropriate To Enhance The Lodestar Amount</u>**

Courts applying the lodestar method in common fund and/or non statutory fee-shifting cases can, and commonly do, apply lodestar multipliers. *Rawlings v. Prudential-Bache Properties, Inc.*, 9 F.3d at 515-17 (Enhancement of the lodestar with a multiplier "can serve as a means to account for the risk an attorney assumes in undertaking a case, the quality of the attorney's work product, and the public benefit achieved." ); *In re Sulzer*, 268 F. Supp.2d at 922; *Staton v. Boeing Co.*, 327 F.3d 938, 968 (9th Cir. 2003).  *See also In re Wash. Pub. Power Supply Sys. Sec. Litig.,* 19 F.3d 1291, 1299 (9th Cir.1994)  ("[The *City of Burlington v. Dague,* 505 U.S. 557, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992) ] rationale for barring risk multipliers in statutory fee cases does not operate to bar risk multipliers in common fund cases."); *See also In re Diet Drugs*, 582 F.3d 524, 545-546 (3d Cir. 2009); *In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 41 (3d Cir. 2009); *Rodriguez v. West Publishing Corp.*, 563 F.3d 948 (9th Cir. 2009);

14

*Central States Southeast and Southwest Areas Health and Welfare Fund v. Merck-Medco Managed Care,* 433 F.3d 181, 194 (2d. Cir. 2005); *Jordan v. City of Cleveland,* 464 F.3d 584, 605-06 (6th Cir. 2006); *Deloach,* 2003 W.L. 23094907 at 9-10; *Wing v. Asarco,* 114 F.3d at 986.

Class Counsel requests a multiplier of 1.3 to support a total fee award of $4.6 Million Dollars. The requested multiplier is justified by review of specific judicially accepted factors:

> (a) the value of the benefits rendered to the class; (b) society's stake in rewarding attorneys who produce such benefits in order to maintain an incentive to others; (c) whether the services were undertaken on a contingent fee basis; (d) the value of the services on an hourly basis; (e) the complexity of the litigation; and (f) the professional skill and standing of all counsel.

> *In re Sulzer,* 268 F. Supp. 2d at 930 *citing Ramey,* 508 F.2d at 1996.

### 1. The Value Of The Benefits Rendered To The Class Supports The Requested Multiplier

As outlined in further detail at pp. 23-31, the value of the benefits rendered to the class are substantial and support the requested multiplier. These benefits include a cash payment of $8.69 for every policy period with a potential total payment of $17,943,693 Million. Additionally, class members have a reversionary interest of $2 Million in the attorney fee fund. Finally, Defendants have paid all of costs of notice and will pay attorney fees to counsel for Plaintiffs.

### 2. The Value To Society Supports The Requested Multiplier

Arguably the most significant accomplishment of this litigation and settlement is the termination of a practice that opened the door to discrimination that most legislatures believed was long closed.

As stated by the Court in *Ramey v. Cinn. Inquirer, Inc.*, 508 F.2d 1188 (6th Cir. 1974), "society's stake" or the societal benefit created by the litigation is a factor to be weighed in establishing a multiplier.  The importance of this consideration was outlined by the Court in *Bebchick v. Washington Metropolitan Area Transit Comm'n*, 805 F.2d 396, 408 (D.C. Cir. 1986):

> Finally, we think that an upward adjustment to the lodestar is appropriate to reflect the **benefits to the public** flowing from this litigation.  It is not unreasonable to consider the **public benefits** of counsel's efforts in determining the level of reasonable compensation.  See, e.g., *City of Riverside v. Rivera*, 477 U.S. 561, 106 S.Ct. 2686, 2693-96, 91 L.Ed.2d 466 (1986) (plurality opinion); *Environmental Defense Fund Inc. v. Environmental Protection Agency*, 672 F.2d 42, 59 (D.C. Cir. 1982) (court awarded upward adjustment of "15-20% to reflect 'benefits to the public from suit,' and 'the delay in receipt of payment for services rendered.'")(citation omitted). (Emphasis added).

The Court in *Fournier v. PFS Investments, Inc.*, 997 F.Supp. at 831 also recognized the relevance of a public benefit in finding an appropriate multiplier:

> However, the Sixth Circuit tacitly approved the use of the lodestar with the additional multiplier in *Rawlings v. Prudential-Bache Properties, Inc.*, a securities case, noting that the multiplier accounts for the inherent risk of litigation, the work product quality, and the **public-benefit achieved**.  9 F.3d at 516 (affirming order by the Hon. Horace Gilmore).  (Emphasis added.)

> *See also Arenson v. Board of Trade*, 372 F. Supp. 1349 (D.C. Ill. 1974) where the

Court held that the "social effect of the litigation" was a substantial factor in the fee determination.

As a result of this litigation, Travelers eliminated their practice of selling identical policies for different prices.[9]  Additionally, the Settlement Agreement expressly prohibits Travelers from reinstating the practice for another three (3) years.

---

[9] As counsel for Defendants made clear during a January 31, 2007 hearing with the Court, the practice of charging multiple prices for identical homeowners insurance was *stopped* because the undersigned counsel sued them for the identical conduct as it related to automobile insurance.  Statement of Counsel for Travelers at Hearing of January 31,

Giving insurance agents the unfettered discretion to sell identical homeowners' policies at different prices allows discrimination on the basis of race, religion, sex, age or on any other basis. It is for this reason that the Ohio legislature in 1953 prohibited the same insurance company from selling identical policies for different prices.[10] Travelers circumvented this prohibition by establishing shell subsidiary companies to sell identical policies at various prices from "different" companies. Travelers' own employee admitted the potential for discrimination created by its practice:

> Q: In the practice that Travelers established of giving the agent discretion, decision making power in determining whether or not a person, a customer will be charged a high premium or a low premium, is there anything in that practice that you have trained agents on, is there anything in that practice that prevents an agent from charging a customer the high price based on race?
>
> MS. VOBORNIK: Objection to the form of the question, compound, assumes facts not in evidence.

---

2007, pp. 17-24. (D.C. Docket No. 42). *See also* testimony of Travelers employee Lucille Mulroy (D.C. Docket No. 84) who testified as follows:

> Q. Okay, at some point then in 2003, Travelers decided to stop this policy with respect to different prices, same policy with respect to agents, is that true?
>
> A. Yes it is.
>
> Q. And, can you tell us why they decided to stop this practice?
>
> A. Yes.
>
> Q. And if you would tell us?
>
> A. There was pending litigation in another state, I believe, and that concerned commissions and we chose to cease the practice. (Deposition of Lucille Mulroy dated March 9, 2007, p. 101. Deposition previously filed at D.C. Docket No. 84).

[10] R.C. §3937.02(D) provides that: "Rates shall not be excessive, inadequate or unfairly discriminatory."

A:      No.

Q:      Is there anything that prevents the agent who has been given this discretion, is there anything that prevents that agent from charging the high price based on religion, sex or ethnicity?

      MS. VOBORNIK:   Objection to the form of the question.

A:      No.

(Deposition of Randall Pillen dated February 22, p. 58.  Deposition previously filed at D.C. Docket No. 85).


Travelers' expert, Lee Covington, II, the former Director of the Ohio Department of Insurance, after questioning by the Court, acknowledged the potential for unregulated, "impermissible", discrimination:

THE COURT:  Help me out.  What if someone says I'm charging a higher commission any time a black person wants a policy than when a white person wants a policy, and that's my differential in cost and, therefore, I'm allowed to charge a different price.   I assume the department would not find that to be acceptable.

THE WITNESS:  That would not be acceptable.

THE COURT:  How does the department do an analysis when someone says the commissions are different, to say the commissions are being charged for an appropriate reason, that the differentials in commissions, and they are not simply saying we've got a commission differential?

THE WITNESS:  I mean, the department would have to monitor marketplace activities to determine if there was, for example, the example you used, racial discrimination.  Obviously, as you said, that would be impermissible and against the law, so that would be through a marketplace monitoring and getting information back from the marketplace.

\* \* \*

18

THE COURT:  And there's no monitoring of who they choose to pay those commissions to and what circumstances in which they choose to pay those commissions?

THE WITNESS:  Other than getting marketplace feedback, no.  In my experience, that issue has not – it's just not been an issue in the marketplace that the department has found that there are problems with.

THE COURT:  Okay.  Has the department ever done an analysis of that questions?

THE WITNESS:  I'm not aware that they have done an analysis of that question.

(Class Certification Hearing Testimony of Lee Covington, dated May 15, 2007, previously filed at D.C. Docket 125.)

Professor Wilbur Leatherberry, an expert for Plaintiffs, outlined in great detail the discriminatory effect of Travelers' practice.  (See attached Exhibit H).  This litigation and settlement have put an end to a practice that admittedly allows discrimination for any number of unacceptable reasons.  This societal benefit, to a greater extent than any of the other recognized factors, justifies the requested multiplier.

### 3. The Fact That Class Counsel Undertook The Litigation On A Contingent Fee Basis Supports The Requested Multiplier

Class Counsel undertook substantial risk in prosecuting this case.  *See, e.g., In re Fernald Litig.* unreported at 1989 WL 267038, at *3 (S.D. Ohio Sept. 29, 1989) (attached as Exhibit Z) (noting that class counsel undertook significant risk, because "[i]f they had not negotiated a successful settlement or obtained a final judgment, they would receive no payment for their thousands of hours of services"); *Cherner v. Transitron Electric Corp.* 221 F. Supp. 55, 61 (D. Mass. 1963) ("No one expects a lawyer whose compensation is contingent upon his success to charge, when successful, as little as he would charge a client who in advance had agreed to pay

for his services, regardless of success."). Counsel assumed the risk in connection with the litigation, prosecuting it, without any compensation, and without any guarantee that the litigation would be successful. This matter, including *Zangara*, has been ongoing for close to five years. As was shown in the history of the litigation section, the litigation was particularly hard fought and contested and significant risk attached to this matter. Nearly 7,775 hours of representation were expended with no guarantee of compensation.

### 4. The Value Of The Services On An Hourly Basis Support The Requested Multiplier

The value of the services provided by Plaintiffs' counsel on an hourly basis totals $3,489,875. (See attached Exhibits A thru G, Affidavits of Counsel with supporting documentation.) As stated above, the significance of this tremendous expenditure of time is that it was done in the face of significant risk of non-payment.

### 5. The Complexity Of The Litigation Supports The Requested Multiplier

The complexity of this matter cannot be overstated. Because the lawsuit involves a highly regulated industry and the rates charged, the filed rate doctrine was and always is a concern. The filed rate doctrine essentially holds that individuals aggrieved by insurance rates approval by the Department of Insurance must seek relief with the Department of Insurance. R.C. §3937.04(D). Therefore, in pursuing this matter Plaintiffs' counsel had to be particularly cognizant of this limiting factor and certain potential causes of action that were necessarily foreclosed. Plaintiffs' counsel had to find a legal theory that would hold Travelers accountable for this practice while simultaneously being certifiable. A difficult task in any litigation but a monumental one when causes of action are eliminated by regulation. Further, certifying a fraud claim based on non-disclosure has a multitude of obstacles. Finally, counsel had to develop the

facts to support the legal theory.  As shown in the History Of The Litigation section, none of these steps were easy or smooth.

In this matter, Plaintiffs' counsel developed all of the facts and legal theories necessary to hold the Defendants responsible for their sales practices.   There were no road maps.  This was not a "cookie-cutter" case.  The theories and factual arguments put forth by counsel were novel.  Specifically, Class Counsel developed the legal theories to address Defendants' challenged sales practices, and selected the causes of action that most clearly captured the misconduct, and were the most likely to facilitate certification of a litigation class.  This Court in speaking about the legal work done by counsel wrote: "Plaintiffs' counsel has diligently identified and investigated potential claims in this action.  The central debate regarding alternate theories of duty, in this case and in *Zangara*, demonstrates counsel has been both thorough and insightful in its analysis of the potential claims of class members."  Memorandum & Order [Class Certification] D.C. Docket No. 141, p. 44.

> **6.**     **The Professional Skill And Standing Of Class Counsel Supports The Requested Multiplier**

As this Court recognized in its January 26, 2009 Memorandum & Order, Class Counsel are respected advocates:

> The second and third factors also favor appointment.  As the Court has already indicated in its *Order Regarding Class Certification*, "[t]he Court is quite familiar with the attorneys and firms who have appeared on Plaintiffs' behalf, all of whom are well-qualified, experienced and capable of conducting class action litigation." (Doc. 128 at 34.)  In addition, the briefing on class certification clearly indicates that the Plaintiffs' counsel has more than adequate knowledge of the applicable law, *i.e.*, the procedural and substantive law applicable to class action proceedings and Ohio law regarding fraudulent concealment.
>
> Finally, the Plaintiffs' counsels' conduct to date, as well as the Court's familiarity with these attorneys and firms, clearly indicates that they have sufficient resources to prosecute this action and intend to apply themselves to the task diligently.

(D.C. Doc. 141 at 44.)

See Affidavits of Class Counsel Exhibits A thru G.

### 7.    Injunctive Relief For Three (3) Years

Where the value to individual class members of benefits deriving from injunctive relief can be accurately ascertained, such relief may be included as part of the Common Fund for purposes of applying the percentage of the fund method. *Staton v. Boeing Co.,* 327 F.3d 938. The settlement agreement enjoins Travelers from selling identical policies for different prices for three (3) years.  Plaintiffs' expert Leonard R. Freifelder, Ph.D., has calculated that this relief has a value of $10,994,733 to the Class.  (See Declaration of Leonard R. Friefelder, Ph.D., attached as Exhibit Y).  Recognizing the common difficulty in accurately ascertaining the value of injunctive relief, the *Staton* court concluded that the existence of injunctive relief can be used as an "enhancement" to justify the requested multiplier.

Based on the factors discussed above, the requested multiplier of 1.3 is well within the range approved by this and other courts.  *See Enterprise Energy Corp. v. Columbia Gas Transmission Corporation*, 137 F.R.D. 240 (S.D. Ohio 1991) (multiplier of 2.4-2.6 approved) ; *Sulzer*, 268 F.supp.2d 907 (Court favorably citing  Stuart J. Logan, Dr. Jack Moshman & Beverly C. Moore, Jr., *Attorney Fee Awards in Common Fund Class Actions,* 24 Class Action Reports (March-April 2003) which found effective multipliers across 1,120 cases studied averaged 3.89);  *Vizcaino,* 290 F.3d at 1051 (lodestar multiplier as check of 3.64); *In re Revco Sec. Litig.*, unreported at 1992 WL 118800 (N.D. Ohio 1992) (attached as Exhibit W) (lodestar multiplier of 2.5); *Bailey v. AK Steel Corp.,* unreported at 2008 WL 553764 (S.D. Ohio 2008) (attached as Exhibit AA) (lodestar multiplier of 3.04 fully warranted); *Behrens v. Wometco Enterprises, Inc.,* 118 F.R.D. 534,  549 (S.D. Fla 1998) ("In cases as complex as this, with risks

of establishing liability as great as in this case, and with legal representation as fine as it was here, a lodestar multiple of three appears to be average"); Newberg on Class Actions, §14.6 (4th Ed. 2009) ("Multiples ranging from one to four frequently are awarded in common fund cases when the lodestar method is applied.")

**C.     The Percentage of the Fund Methodology As A Check Does Not Render The Requested Fee Unreasonable**

After applying the lodestar method, courts often check the reasonableness of a fee request by looking to the percentage of the fund approach.   *In re Sulzer* 268 F. Supp.2d at 922, *citing Bowling v. Pfizer, Inc.*, 102 F.3d at 779; *Fournier v. PFS Investments, Inc*., 997 F.Supp. at 831; *See also Vizcaino v. Microsoft Corp.,* 290 F.3d at 1047, 1050.  This cross check approach requires the court to consider what percentage of the total class benefit is represented by the fee.

In its analysis, the Court must first determine the value of the benefit fund in order to calculate the percentage represented by the requested fee.  Controlling law supports inclusion of the following to determine the value of the fund:

| | |
|---|---|
| Benefit Fund  - midpoint between the available benefit ($18 million) and the estimated actual payment ($3-$4 Million)[11]: | $10.5 - $11 Million |
| Reversion From Attorney Fee Fund: | $2 Million |
| Attorney Fees: | $4.6 Million |
| Costs of Notice and Administration: | $420,306 |
| TOTAL BENEFIT: | $17,520.306 - $18,020.306 |

**1.     Claims Actually Paid**

---

[11] The exact amount of claims actually paid cannot be determined until the claims process ends on February 17, 2010.  Oseas Declaration, ¶15. The above estimate is based on claims already received.  The Court may choose to delay its decision until this number can be determined with certainty.

The first element making up the total benefit to the Class is represented by the value of the benefit fund.  The proposed settlement establishes a fund in excess of approximately $18[12] million **available** to class members who timely submit a claim form.  Because not all class members will return a claim form, the entire $18 Million will not be paid to the class.  Because the claims process is not complete, the amount actually paid to Class members is estimated to be $3 - $4 Million.  The settlement further provides that the portion of the fund that remains unclaimed will revert back to the Defendants.  Whether the fee percentage of the Fund should be calculated using the $18 Million available payout or the estimated actual payout is a matter of unsettled law.

In *Boeing Co. v. Van Gemert*, 444 U.S. 472, 479-81 (1980), the Supreme Court recognized that the entire available fund was a benefit to the class:

> In this case, the named respondents have recovered a determinate fund for the benefit of every member of the class whom they represent . . ..  To claim their logically ascertainable shares of the judgment fund, absentee class members need prove only their membership in the injured class.  Their right to share the harvest of the lawsuit upon proof of their identity, whether or not they exercise it, is a benefit in the fund created by the efforts of class representatives and their counsel.

*Boeing v. Van Gemert*, 444 U.S. 472, 479-81 (1980).

Since *Boeing*, however, consideration of unclaimed funds in the determination of attorneys' fees has been discouraged and even statutorily barred in certain contexts.  The Private Securities Litigation Reform Act ("PSLRA"), for example, enacted in 1995, expressly limits fees in the context of securities litigation to a "reasonable amount of any damages and prejudgment interest *actually paid* to the class."  15 U.S.C. §§ 77z-1(a)(6); 78u-4(a)(6) (emphasis).

---

[12] The total cash pool available to claimants is $17,943,693.18.  Oseas Declaration, ¶4.

Although the Rules of Civil Procedure themselves are silent on the issue, citing the securities legislation, The Advisory Committee Notes to the 2003 amendments to Rule 23, subd. h, suggest that courts examine the extent to which claims procedures result in *actual* payouts to the class.

> For a percentage approach to fee measurement, results achieved is the basic starting point. In many instances, the court may need to proceed with care in assessing the value conferred on class members. Settlement regimes that provide for future payments, for example, may not result in significant actual payments to class members. In this connection, the court may need to scrutinize the manner and operation of any applicable claims procedure. In some cases, it may be appropriate to defer some portion of the fee award until actual payouts to class members are known

Citing these Advisory Committee notes, the Manual for Complex Litigation also endorses a fee award that is based on funds actually bestowed. *See also* Federal Judicial Center. *Manual for Complex Litigation* (Fourth) § 21.71 (2004).

> In cases involving a claims procedure or a distribution of benefits over time, the court should not base the attorney fee award on the amount of money set aside to satisfy potential claims. Rather, the fee awards should be based only on the benefits actually delivered. It is common to delay a final assessment of the fee award and to withhold all or a substantial part of the fee until the distribution process is complete.

Finally, in the 2005 Class Actions Fairness Act ("CAFA"), Congress required that where "a proposed settlement in a class action provides for a recovery of coupons to a class member, the portion of any attorney's fee award to class counsel that is attributable to the award of the coupons shall be based on the value to class members of the *coupons that are redeemed*." 28 USCA § 1712 (a) (emphasis added).

Courts have split on valuing the fund from which percentage fees should be calculated. Several have based percentage fee awards on only those amounts actually claimed. *See*, e.g.,

S*trong v. BellSouth Telecommunications, Inc.*, 137 F.3d 844, 852-53 (5th Cir. 1998); *Wise v. Popoff*, 835 F.Supp. 977, 982 (E.D.Mich. 1993). *Strong* involved the settlement of an antitrust class action resulting in a $64 million reversionary fund. In that case, the Fifth Circuit affirmed the district court's decision to base attorney fees on the actual claims awarded. *Id.*

In *Wise*, even prior to the passage of the PSLRA, a court in the Eastern District of Michigan found it more reasonable to calculate fees based upon a percentage of the actual recovery. *Wise v. Popoff*, 835 F.Supp. 977, 982 (E.D.Mich. 1993):

> Although the Supreme Court has authorized courts to award attorney's fees based on the entire fund, *Boeing Co. v. Van Gemert*, 444 U.S. at 478-9, 100 S.Ct. at 749, the Court notes that such a method is not mandated.

*Id.*

Others courts continue to assess the total amount of the fund available – irrespective of the actual amount claimed. In *Masters v. Wilhelmina Model Agency, Inc.*, 473 F.3d 423 (2nd Cir. 2007), for example, the Second Circuit held that the district Court had abused its discretion in calculating attorneys fees based upon the funds actually claimed rather than upon the entirety of the funds available. The court rebuffed the lower court's suggestion that basing attorney fees upon the latter would create a windfall for attorneys. The Court further rejected the lower court's reliance upon PSLRA ("[T]he PSLRA is not applicable to antitrust class actions such as the one before us . . .. The fee restrictions described in the PSLRA do not apply in any context other than securities class actions."). *Id.* at 437. The Court similarly found the lower court's reliance upon CAFA to be misplaced.

> The CAFA recites as its purpose the following: "To amend the procedures that apply to consideration of interstate class actions to assure fairer outcomes for class members and defendants, and for other purposes." Class Action Fairness Act, Pub.L. No. 109-2, 119 Stat. 4 (2005). However, the only mention of fees to

26

be allowed to class counsel deals with the award of fees in coupon settlement cases. See 28 U.S.C. § 1712(a)-(c).FN2

*Id.* at 438.

Other courts have similarly endorsed a calculation of fees based upon the funds available. *See*, e.g., *Williams v. MGM-Pathe Commun. Co.*, 129 F.3d 1026 (9th Cir.1997); *McKinnie v. JP Morgan Chase Bank, N.A.* 2009 WL 5217673 (E.D.Wis. 2009), *unreported* (see attached Exhibit V); *Waters v. Int'l Precious Metals Corp.*, 190 F.3d 1291 (11th Cir.1999); *cert. denied.*, 530 U.S. 1223, (2000). In *Williams*, 129 F.3d 1026, the settlement of a securities fraud class action resulted in a reversionary fund of $4.5 million, of which class members had claimed $9,900. *Id.* at 1027. There, the Ninth Circuit held that the district court had abused its discretion in calculating attorney fees to be one-third of the claimed fund – or $3,300 rather than one-third of the total fund, for a fee of approximately $1.5 million *Id.*

In *McKinnie v. JP Morgan Chase Bank, N.A.*, *supra.*, 2009 WL 5217673, the parties agreed to a settlement creating a total fund of 2.1 million dollars. Thereafter, however, only a small number of class members filed claims. Even including the more than $310,000 that was paid to the cy pres, the fund was depleted by only $500,000, with the remainder reverting back to the defendants. *McKinnie citing Boeing v. Van Gemert*, *444 U.S. 472, and Williams v. MGM-Pathe Commun. Co.,* 129 F.3d 1026, the court awarded an attorney fee of $625,000, which represented 30 percent of the 2.1 million dollar fund. The court additionally found support for its total fund approach in Alba Conte & Herbert B. Newberg, *Newberg on Class Actions* § 14:6, p. 570 (4th ed.2002) (stating that *Boeing* settled the issue of whether the benchmark common fund amount for fee award purposes is made up of the amount claimed by class members or the amount potentially available to class members by ruling that class counsel are entitled to a

27

reasonable fee based on the funds potentially available to be claimed, regardless of the amount actually claimed.).

In *Waters*, a class of plaintiffs sued a commodities brokerage house alleging fraud. Settlement of the case resulted in a $40 million dollar reversionary fund, of which less than $6.5 million dollars was actually claimed.  The 11th Circuit endorsed the district court's award of $13,333,333 (one-third of the total fund).  In doing so, the Court declined to apply the policy of the PSLRA, finding it "unlikely that the PSLRA applied to commodities actions."  The Court was also not influenced by the reversionary nature of the settlement.  190 F.3d at 1297-98.

While denying the petition for writ of certiorari in *Waters*, Justice O'Connor acknowledged the above split in authority, expressing some concern about the lower court's fee award.

> In *Boeing Co. v. Van Gemert*, 444 U.S. 472, 100 S.Ct. 745, 62 L.Ed.2d 676 (1980), we upheld an award of attorney's fees in a class action where the award was based on the total fund available to the class rather than the amount actually recovered. Id., at 480-481, 100 S.Ct. 745. We had no occasion in *Boeing*, however, to address whether there must at least be some rational connection between the fee award and the amount of the actual distribution to the class. The approval of attorney's fees absent any such inquiry could have several troubling consequences. Arrangements such as that at issue here decouple class counsel's financial incentives from those of the class, increasing the risk that the actual distribution will be misallocated between attorney's fees and the plaintiffs' recovery. They potentially undermine the underlying purposes of class actions by providing defendants with a powerful means to enticing class counsel to settle lawsuits in a manner detrimental to the class. And they could encourage the filing of needless lawsuits where, because the value of each class member's individual claim is small compared to the transaction costs in obtaining recovery, the actual distribution to the class will inevitably be minimal. The Courts of Appeals have differed in their approaches to the problem. Compare *Strong v. BellSouth Telecommunications, Inc*., 137 F.3d 844, 852 (C.A.5 1998) (District Court did not abuse its discretion in basing fee award on actual payout rather than reversionary

28

fund), with *Williams v. MGM-Pathe Communications Co.*, 129 F.3d 1026, 1027 (C.A.9 1997) (benchmark for fee award is 25% of entire fund, and District Court abused its discretion in basing award on actual distribution to class)…

…I believe the importance of the issue counsels in favor of granting review in an appropriate case.

*See International Precious Metals Corp. v. Waters*, 530 U.S. 1223 (2000).

There is clearly a split in authority on this issue.  On one side, there is wisdom in the words of Justice O'Connor that caution against basing a fee on the total fund **available** which results in the "decoupling of class counsel's financial incentives from those of the class."  On the other side, there is logic in the Supreme Court's position that there is benefit in a class member's "**right** to share the harvest of the lawsuit…whether or not they exercise it."  *Boeing,* 444 U.S. at 474.

Recognizing the merit of each position, a compromise is suggested that satisfies, to a degree, both positions.  The compromise would have the Court take the mid-point between the amount available ($18 Million) and the amount actually claimed ($3-$4 Million) and use this number ($10.5-$11 Million) to establish the value of the benefit fund.  This approach is unique, however.  Under this approach, there would not be a "decoupling" of class counsel's monetary incentives from those of class members and at the same time, there would be recognition of the benefit created by a class member's right to compensation.

### 2.      Reversion From the Attorney Fee Fund

Subsequent to the original Settlement Agreement the parties agreed that Defendants would pay to Class members the difference between any court awarded fees and $6.6 Million.  This reversionary payments to Class members shall not exceed $2 Million.  Given that Class Counsel has only requested $4.6 Million in fees, it is virtually guaranteed that the Class will

receive an additional $2 Million.  An amended Settlement Agreement will be filed with the Court.

### 3.      Costs of Notice and Administration

The value of the Settlement Fund includes $420,306.00 in notice and administration costs.  (Oseas Declaration).    This expense that is being borne by the Defendants and not the Plaintiffs is properly considered a benefit to class.  "The district court also did not abuse its discretion by including the cost of providing notice to the class of the proposed consent decree as parts of its putative fund valuation….  The post-settlement cost of providing notice can reasonably be considered a benefit to the class."    *Staton v. Boeing Co.,* 327 F.3d at 975.  "[T]he biggest monetary benefit to the Class is FUSA's agreement, under the Settlement, to bear the costs of providing Class Notice and administering the Settlement which is an expense that would ordinarily be borne by class action plaintiffs."  *Mangone v. First USA Bank*, 206 F.R.D. 222, 228 (S.D. Ill. 2001).

### 4.      Attorney Fees And Expenses Paid By Defendant

In the present matter, the Defendants have agreed to pay attorneys' fees and expenses in an amount not to exceed $6.6 Million.  Class Counsel has requested $4.6 Million.  This payment of fees and expenses is properly considered part of the common fund.  "The Court feels that it is appropriate to regard the attorneys' fees as comprising part of the constructive common fund." *In re Vitamins Antitrust Litig.*, 2001 WL 34312839 (D.D.C. 2001) at 9 (unreported) (see attached Exhibit BB).  In *Johnston v. Comerica Mortgage Corp.*, 83 F.3d 245-246, the Court made a similar finding:

> The award to the class and the agreement on attorney fees represent a package deal.  Even if the fees are paid directly to the attorneys, those fees are still best viewed as an aspect of the class' recovery.  *See In re General Motors*, 55 F.3d at 821.

Putting each of the described elements together, the value of the total benefit to class members is $17.5-$18 Million. The requested fee of $4.6 Million is 25.6-26.2% of the total benefit. Application of the *Ramey* factors, as done previously in the lodestar analysis, supports the reasonableness of this percentage. Additionally, this percentage is within the range approved by other courts. *See In re Future Healthcare Sec. Litig.*, No. C-1-95-180 (S.D. Ohio Dec. 5, 2000) (30% fee awarded), (See attached Exhibit I); *In re Valley Sys. Sec. Litig.*, No. 5:92cv2124 (N.D. Ohio Eastern Division Mar. 16 1994) (30% award plus expenses) (See attached Exhibit J); *In re Nord Res. Sec. Litig.*, No. C-3-90-380 (S.D. Ohio Apr. 28, 1994) (awarding approximately 30%) (See attached Exhibit K); *In re Structural Dynamics Research Corp. Sec. Litig.*, No. C-1-94-630 (S.D. Ohio Mar. 22, 1996) (equivalent of a 30% award which included expenses) (See attached Exhibit L); *In re Cincinnati Gas & Elec. Co. Sec. Litig.*, 643 F.Supp. 148, 150 (S.D. Ohio 1986); *In re Cincinnati Microwave, Inc. Sec. Litig.*, No. C-1-95-905 (S.D. Ohio Mar. 21, 1997) (30% plus expenses) (See attached Exhibit M); *In re Gibson Greetings Sec. Litig.*, No. C-1-95-265 (S.D. Ohio Feb. 7, 1997) (equivalent of 33% awarded plus expenses) (See attached Exhibit N); *In re Gliatech, Inc. Sec. Litig.*, No. 1:100CV2236 (N.D. Ohio, Eastern Division May 13, 2003) (33% plus expenses) (See attached Exhibit O); *In re Trustcorp Sec. Litig.*, No. 3:89-CV-7139 (N.E. Ohio Western Division, Aug. 30, 1990) (30% plus expenses) (See Exhibit P); *In re Advanced Lighting Technologies, Inc. Sec. Litig.*, No. 1:99CV836 (N.D. Ohio Eastern Division Jan. 17, 2003) (30% plus expenses) (See attached Exhibit Q) *Vijay Sherma, etc v. Cole National Corp.*, No. 1:02CV2397 (N.D. Ohio Eastern Division September 29, 2003) (30% fee plus expenses) (See attached Exhibit R). State court actions from Ohio have also consistently awarded percentages that are greater than that sought by counsel in this matter. *See S/O ex rel White v. Cuyahoga Metropolitan Housing Auth.*, unreported at 1998 WL 934857 (Ohio App. 8th

31

Dist. Dec. 29, 1988) at *3 (awarding as attorneys' fees 40% of the common benefit rendered to class, which was "back vacation time credit") (See attached Exhibit S); *Kathryn Harlow Holznagel v. Charter One Bank, F.S.B.*, CV-98-362560 (Cuyahoga County, June 25, 2003) (awarding 30% fee) (See attached Exhibit T);  *Santos v. Administrator – Ohio Bureau of Workers' Compensation,* CV-99-393694 (Cuyahoga County, April 13, 2005) (awarding 33.3% fee) (See attached Exhibit U).

## V.    CONCLUSION

The resolution of this case was the result of over five (5) years of contentious litigation. The settlement and requested fee represent the good faith efforts of class counsel.  In the primary lodestar analysis, the fee is justified by a conservative multiplier of 1.3.  Using the percentage of the fund method as a check, the requested fee is 25.6-26.2% of the total class benefit.  Both methods lead to results within the parameters established in the 6th Circuit in awarding attorneys fees.

For the foregoing reasons, Class Counsel requests that this Court award attorneys fees, including expenses, in the amount of $4.6 Million.


Dated:  January 25, 2010.                          Respectfully submitted,


                                                    /s/ R. Eric Kennedy
                                                   R. Eric Kennedy (0006174)
                                                   Daniel P. Goetz (0065549)
                                                   Weisman, Kennedy & Berris Co., L.P.A.
                                                   Suite 1600 Midland Building
                                                   101 Prospect Avenue, West
                                                   Cleveland, Ohio 44115
                                                   (216) 781-1111
                                                   (216) 781-6747 (fax)
                                                   ekennedy@weismanlaw.com
                                                   dgoetz@weismanlaw.com

Don Barrett
Don Barrett, P.A.
P.O. Box 987
404 Court Square North
Lexington, Mississippi 39095
(662) 834-2376
(662) 834-2628 (fax)
dbarrett@barrettlawoffice.com

Charles Barrett
Barrett & Associates, P.A.
6518 Highway 100
Suite 210
Nashville, Tennessee 37205
(615) 515-3393
(615) 515-3395 (fax)
cb@barrettandassociates.net

Tom Thrash
1101 Garland Street
Little Rock, AR  72201
(501) 374-1058
tomthrash@sbcglobal.net

Pierce Gore
Gore Law Firm
P.O. Box 33194
Los Gatos, CA  95031-3194
(408) 806-4600
(408) 376-0757
piercegore@yahoo.com

*Counsel for Plaintiff and the Class*

## CERTIFICATE OF SERVICE

I hereby certify that on January 25, 2010, the foregoing was filed electronically.  Notice
of this filing will be sent to all parties by operation of the Court's electronic filing system.

Parties may access this filing through the Court's system.  Additionally, the foregoing was emailed to Theodore H. Frank, attorney for Objector Daniel Greenberg, at tedfrank@gmail.com.

*/s/ R. Eric Kennedy*
R. Eric Kennedy (0006174)
Weisman Kennedy & Berris Co., L.P.A.